**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2013-CA-01287-COA**

**BILLY STEPHEN MCKISSACK**                                              **APPELLANT**

**v.**

**TERRI MCKISSACK**                                                            **APPELLEE**

DATE OF JUDGMENT:                05/02/2013
TRIAL JUDGE:                          HON. H.J. DAVIDSON JR.
COURT FROM WHICH APPEALED:  LOWNDES COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:       MARC DARREN AMOS
ATTORNEY FOR APPELLEE:        JAK MCGEE SMITH
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:       DIVIDED MARITAL PROPERTY AND
                               AWARDED THE APPELLEE $250,000 IN
                               LUMP-SUM ALIMONY
DISPOSITION:                   AFFIRMED: 05/05/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE LEE, C.J., BARNES AND MAXWELL, JJ.**

**MAXWELL, J., FOR THE COURT:**

¶1.     This is Billy Stephen McKissack's (Steve's) second appeal of the property distribution

and alimony award to his ex-wife, Terri McKissack.  In Steve's first appeal, we found the

chancellor wrongly classified a $500,000 certificate of deposit as marital property.  So we

remanded the case, instructing the chancellor to consider the CD as Steve's separate property

and to revisit the equitable distribution and alimony award.

¶2.     On remand, the chancellor did just that, assessing the marital property and awarding

Terri lump-sum alimony to adjust for the resulting shortfall once the CD had been removed

from the marital pot. While Steve now insists the chancellor improperly valued assets and debts using the original divorce-hearing date, instead of a later date after which Steve had acquired new debt, we disagree. In Mississippi, chancellors have discretion in setting valuation dates. And for distribution purposes, it was not error for the chancellor to value the marital estate at the time of divorce, since assets accumulated after a divorce are generally not marital property. We likewise find no error in the chancellor's handling of the division and his award of lump-sum alimony to Terri. We affirm.

## Facts and Procedural History

### The Property Division

#### A.     The First Go-Round

¶3.     Steve and Terri agreed to an irreconcilable-differences divorce but submitted property distribution and alimony issues to the chancellor. In dividing the property, the chancellor designated State Termite—a company Steve had inherited from his parents—as Steve's separate property. But citing the family-use doctrine, the chancellor classified $542,000 in certificates of deposits distributed from State Termite to Steve as marital property. In divvying this CD-based marital property, Terri was awarded a $500,000 CD and Steve a $42,000 CD. This allocation was part of the larger property split, where Terri was awarded assets valued at $1,234,035.35 and Steve received $1,080,812.05. Steve also retained ownership of $1,000,000 in non-marital shares of State Termite. And he kept his non-marital interest in an apartment complex (Academy Crossing), valued at $212,500. The chancellor

2

also ordered Steve to pay Terri $6,000 in periodic alimony each month.

¶4.      Steve appealed the chancellor's division of the CDs and the periodic-alimony award.

### B.      The Intervening Fire

¶5.      While Steve's first appeal was pending, he suffered a financial loss when Academy Crossing Apartments caught fire.  Several tenants died in the December 2009 fire, and an entire building was destroyed.  Lawsuits soon followed.  Because of the fire, the complex owner, Millie Rollins,[1] defaulted on a $1,300,000 loan.  This default made Steve responsible for the debt as  guarantor.  After applying insurance proceeds and personal funds to the debt, Steve still owed $482,000.

### C.      Holding in McKissack I

¶6.      In Steve's first appeal, *McKissack v. McKissack*, 45 So. 3d 716, 722 (¶34) (Miss. Ct. App. 2010) (*McKissack I*), we found the $542,000 held in CDs was *not* commingled with marital funds.  So it should have remained Steve's separate property.  *Id*.  This mistake required we remand the case for the chancellor to "revisit the issues of equitable distribution and alimony." *Id*. at 723 (¶41).  We emphasized that because these "issues are intertwined," any "change in the division of the marital estate may necessitate a change in the award of periodic alimony." *Id*.

### D.      Holding on Remand

---

[1]  The chancellor found Steve was "secretive and disingenuous" with Terri about his relationship with Millie.  He felt Steve's decision to invest in Millie's business may have been impaired by their purportedly romantic relationship.

¶7. On remand, in 2012, Steve urged the chancellor to consider his newly acquired debt from the post-divorce apartment fire. But the chancellor chose to value Steve and Terri's financial assets as of the divorce hearing date. Aside from wrongly labeling the $500,000 CD as Steve's separate property, the chancellor still felt the previously distributed amounts were equitable. He also detailed why he could not meet the goals of a fair distribution by re-dividing the remaining marital property.

¶8. Fashioning what he believed was a fair remedy, the chancellor worked through the *Ferguson, Armstrong,* and *Cheatham* factors he found relevant to his decision to adjust the distribution by awarding Terri $250,000 in lump-sum alimony, payable at the rate of $2,000 per month. This was added to the earlier $6,000 monthly periodic-alimony award. All other earlier-distributed property remained undisturbed. Steve also appealed this decision.

## Discussion

¶9. As Steve sees it, the chancellor's distribution of marital assets was "unfair" because he gave too little weight to Steve's newly acquired debt from the apartment fire. He also insists the chancellor should have conducted a *Ferguson* analysis anew on remand and improperly skimped on the *Cheatham* factors. After review, we find no error in the chancellor's methodology.

### I. Equitable Distribution After Remand

¶10. There are three general tasks required of a chancellor's division of marital assets in divorce cases. The chancellor must "(1) classify the parties' assets as marital or separate, (2)

4

determine the value of those assets, and (3) divide the marital estate equitably based upon the factors set forth in *Ferguson*." *Rhodes v. Rhodes*, 52 So. 3d 430, 436 (¶18) (Miss. Ct. App. 2011) (citation omitted) (citing *Ferguson v. Ferguson*, 639 So. 2d 921, 928-29 (Miss. 1994)).[2] We review a chancellor's equitable division under the familiar manifest-error standard of review. *Vaughn v. Vaughn*, 56 So. 3d 1283, 1288 (¶17) (Miss. Ct. App. 2011).

### A. Newly Acquired Debt

¶11. To Steve, his losses from the apartment fire were reason enough to not have to pay

---

[2] The eight *Ferguson* factors are:

1. Substantial contribution to the accumulation of the property[, such as:] . . . a. Direct or indirect economic contribution to the acquisition of the property; b. Contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties[,] and duration of the marriage; and c. Contribution to the education, training[,] or other accomplishment bearing on the earning power of the spouse accumulating the assets[;] 2. The degree to which each spouse has expended, withdrawn[,] or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree[,] or otherwise[;] 3. The market value and the emotional value of the assets subject to distribution[;] 4. The value of assets not ordinarily, absent equitable factors to the contrary, subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; 5. Tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution; 6. The extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; 7. The needs of the parties for financial security with due regard to the combination of assets, income[,] and earning capacity; and, 8. Any other factor which in equity should be considered.

*Gillespie v. Gillespie*, 106 So. 3d 869, 874 (¶23) (Miss. Ct. App. 2013) (quoting *Ferguson*, 639 So. 2d at 928).

additional lump-sum alimony.   And he argues it was wrong for the chancellor not to have re-valued the marital estate, giving more weight to his newly acquired, non-marital debt from the apartment fire.

¶12.   But on remand, the chancellor opted to use the property values already "in evidence at the trial on the merits"—rightly noting that the "date of valuation is discretionary with the court."   Because he had already valued the property as of the divorce hearing date when making his findings, he found "any accumulation of additional assets or the appreciation of awarded assets should be classified as separate property[.]"  Steve urges it was wrong for the chancellor to use the divorce hearing date as the "point of demarcation for valuation."

### B.   Valuation Date

¶13.   Steve's argument is blunted by the fact that chancellors are given deference in setting the valuation date for equitable distribution of marital property. *Holdeman v. Holdeman*, 34 So. 3d 650, 654 (¶13) (Miss. Ct. App. 2010).  Often chancellors deem the date of the divorce hearing or judgment as the line of demarcation. *See Wheat v. Wheat*, 37 So. 3d 632, 637 (¶15) (Miss. 2010).  The date of entry of a separate maintenance order or temporary support order may also serve as the valuation date. *Id.* (citing *Godwin v. Godwin*, 758 So. 2d 384, 386 (¶7) (Miss. 1999)).  But this deference is measured against the general notion that "assets should be valued as close to the trial date as feasible."  Debbie Bell, *Mississippi Family Law* § 6.07[3] (2005).

¶14.   The trial-date approach is the route the chancellor took here.  He made a common-

sense decision that the date of the divorce hearing would be the cut-off point. He held any later-accumulated assets or appreciation of already-awarded assets would be separate property. *See Henderson v. Henderson*, 757 So. 2d 285, 293 (¶37) (Miss. 2000) (On remand, the supreme court held a husband's one-half interest in the marital home should be valued from the divorce date—not several years after the case had been appealed and retried, during which time the wife had been paying the mortgage on an appreciating asset). The chancellor was, however, aware of authority that post-divorce passive appreciation of asset values could be included.[3] But he found no proof of passive appreciation here.

¶15. What Steve largely overlooks is that his preferred valuation date cuts both ways. It is true the chancellor gave little weight to Steve's newly acquired *debt* for valuation purposes. But he also refrained from tampering with Steve's possibly new *assets*—though he perceived Steve's income was greater and his expenses lower than when the couple divorced. Also, the chancellor highlighted that the resulting debt from the apartment fire was not from Terri's wrongdoing or fault. The apartment was Steve's separate property. And it was Steve who chose to sign as guarantor for his claimed paramour Millie's debt in the complex. For these reasons, and those we explain below, we cannot say the chancellor erred in relying more on his initial valuations than Steve's new debt.

      *C.*    Ferguson *Analysis*

---

[3] The chancellor cited Brett R. Turner, *Equitable Division of Property* § 7.6, at 648-49 n.124 (3d ed.).

¶16.    Steve is also upset that the chancellor did not conduct a *Ferguson* analysis anew.  Our review of this assertion brings us back to the chancellor's original distribution.  We have to consider this argument against the reality that other than the CD, all other assets were properly classified in the original *Ferguson* analysis—an analysis he still believed was fair.

¶17.    The chancellor felt his original division "satisfied the *Ferguson* factors as to the value of [the] parties' separate estates and the ability to maintain and make use of those assets." But he rightly noted that with the $500,000 CD no longer deemed marital property, Steve's separate estate was now bolstered by this sum.  So the chancellor set out to adjust the diminished value of Terri's initial take.  His main quandary was finding the best way to do that.

¶18.    The chancellor's original emphasis upon divorce was to divide the property equitably in a way that would cause minimal friction while ensuring the property awarded was manageable by each party.  Thus, his initial distribution awarded the investment property to Steve, because Steve had initiated the investment and was better suited to "manage" and "grow" it.  Terri was awarded the fund accounts, which "required little maintenance and oversight."   As the chancellor saw it, any first-blush appearance of the benefit of the liquidity of the funds awarded to Terri was balanced against the accompanying penalties she faced for early withdrawal and the steady income, debt service, and tax incentive the real property gave Steve.

¶19.    On remand, after revisiting this earlier award, the chancellor thought ginning up a new

division would frustrate his initial goals of equitably dividing the marital property. He believed Steve should retain the rental property and his desired personal items. And it was obvious that, without the $500,000 CD, Terri suffered a deficit certainly not curable by taking more property from her. In the chancellor's eyes, there were two simple ways to reach a similar "bottom line" after excluding the non-marital CD—either (1) giving Terri a larger share of marital property or (2) more alimony.

¶20. Because he had already applied *Ferguson* in his original opinion, the chancellor found further overarching comment on his initial analysis and conclusion was unnecessary. But he did emphasize—"(1) the needs of the parties, (2) the elimination of the need for alimony, and (3) the separate estates of each party" were indeed relevant to his decision on remand. And his new award referenced his earlier *Ferguson* analysis. In short, the chancellor did all that was required to properly classify, value, and distribute the marital estate. His well-thought-out approach sufficiently complied with *Ferguson* and fairly administered the marital estate in a way that prevented a shortcoming to Terri.

## II. Lump-Sum Alimony

¶21. As mentioned, a lump-sum-alimony award was how the chancellor filled Terri's shortfall. And Steve's next argument focuses on the lump-sum-alimony award, claiming this too was error.[4]

---

[4] Steve also claims he has no present ability to pay an additional $2,000 per month in lump-sum alimony due to his newly acquired, non-marital debt from the house fire. But as noted by the chancellor, compared to the time of the original hearing, "Steve's income is

9

### A. The Award

¶22. Once marital property is equitably distributed, "[i]f there are sufficient assets to provide for both parties, then there is no more to be done. But if there is a deficit for one party, the chancellor should consider alimony." *Carter v. Carter*, 98 So. 3d 1109, 1112 (¶8) (Miss. Ct. App. 2012) (citing *Johnson v. Johnson*, 650 So. 2d 1281, 1287 (Miss. 1994)). Lump-sum alimony has "been described as a method of dividing property under the guise of alimony[,]" but regardless of how it is coined, it is an authorized tool to prevent unfair property division. *See Ferguson*, 639 So. 2d at 926. (citations omitted).

¶23. Both this court and the supreme court have held lump-sum alimony may be awarded when marital property is not easily divided between the parties. *Dickerson v. Dickerson*, 34 So. 3d 637, 645 (¶32) (Miss. Ct. App. 2010); *cf. Haney v. Haney*, 907 So. 2d 948, 955 (¶29) (Miss. 2005) ("*Haney III*") (lump-sum alimony was unnecessary since the property at issue was money, which was easily divisible). Here, the chancellor found the remaining marital property—the substantial rental property—was not easily divisible. It was impractical to expect Terri, who lives in Arkansas, to manage Mississippi rental property, especially when she has no property-management experience. And with the CD no longer a part of the marital pot, the property distribution now bolstered Steve's estate and left Terri a substantial deficit. The chancellor addressed this deficit by awarding Terri lump-sum alimony.

---

now greater, and his expenses are lower, i.e., he no longer has two mortgage payments and the children are now over 21 years of age and child support has terminated." Steve has also inherited several new assets since the divorce.

¶24. As we emphasized in Steve's first appeal: "Alimony is not a completely independent financial issue in a domestic case." *McKissack*, 45 So. 3d at 723-24 (¶42). It works together with equitable distribution—"*where one expands, the other must recede*." *Id*. (emphasis added). Since the marital property had receded, we find the chancellor had discretion to increase Terri's alimony to assure a fair property division.

### B. Cheatham *Factors*

¶25. Steve's final attack on the lump-sum-alimony award hones in on the *Cheatham* factors. Though he says the chancellor's lump-sum-alimony award did not address them, the record shows he did. So his *Cheatham* argument is also unfounded.

¶26. There are various factors chancellors must consider when lump-sum alimony is contemplated. These so-called *Cheatham* factors are:

> (1) the substantial contribution to accumulation of total wealth of the payor either by quitting a job to become a housewife, or by assisting in the spouse's business; (2) a long marriage; (3) where recipient spouse has no separate income or the separate estate is meager by [the] comparison; and (4) the receiving spouse would lack any financial security without the lump-sum award.

*Cheatham v. Cheatham*, 537 So. 2d 435, 438 (Miss. 1988). When cases involve the award of lump-sum alimony—like this one does—"the single most important factor undoubtedly is the disparity of the separate estates." *Id.*

¶27. The chancellor emphasized that his *previous* "periodic alimony" award "took into consideration Terri's access to 'liquid' assets, notably the CD." And "without reiterating the *Armstrong* factors," from his original award, he noted "the marriage was a long one, [and]

11

Terri did not work[,]" was over fifty-five years old, and could not earn a wage to support "herself in her accustomed style and manner of living."

¶28. In fashioning the *new* lump-sum-alimony award as part of the equitable division, the chancellor made a variety of similar findings, covering all four *Cheatham* factors. His order on remand emphasized he had "consider[ed] the former division, the financial status of each party as shown at the hearing, [and] the *Armstrong* and *Cheatham* . . . factors[.]" He clarified that his initial intent was to provide Terri with "liquid property." He also touched on Terri's "contributions . . . to a long and fruitful marriage" of approximately twenty-five years. Based on her "domestic duties and child rearing[,]" he found she was entitled "to a fair and equitable division of the marital estate" and alimony.

¶29. The disparity of the separate estates was the chancellor's primary concern. He found Steve's separate estate was far greater than Terri's, since he retained his company—a business worth $1,000,000 to $3,000,000, depending on the party asked. With the $500,000 CD now deemed Steve's separate property, he found Terri's need for alimony or additional marital property was greater. Thus, based on "*Armstrong* and *Cheatham*" and his original analysis, the chancellor awarded Terri $250,000 in lump-sum alimony, payable at "$2,000.00 per month beginning June 1, 2013, until paid in full or until further order." He reasoned the "additional alimony awarded will be roughly equivalent to almost equal division of the marital estate only."

¶30. So the chancellor did indeed explicitly consider all *Cheatham* factors. Because we

12

find no manifest or clear error in the lump-sum-alimony award as part of distributing the marital estate, we affirm.

¶31.    **THE JUDGMENT OF THE LOWNDES COUNTY CHANCERY COURT IS AFFIRMED.    ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS, CARLTON AND FAIR, JJ., CONCUR. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.**