# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2017-CA-00213-COA

JASON CASTLE                                                                                          APPELLANT

v.

MARY CASTLE                                                                                              APPELLEE

DATE OF JUDGMENT:                    12/20/2016
TRIAL JUDGE:                                HON. JERRY G. MASON
COURT FROM WHICH APPEALED:    LAUDERDALE COUNTY CHANCERY
                                                    COURT
ATTORNEY FOR APPELLANT:         DAVID BRIDGES
ATTORNEY FOR APPELLEE:           MARK A. CHINN
NATURE OF THE CASE:                 CIVIL - DOMESTIC RELATIONS
DISPOSITION:                            AFFIRMED: 10/16/2018
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**FAIR, J., FOR THE COURT:**

¶1.     After fifteen years of marriage, Mary and Jason Castle separated as a result of Jason's

adultery. The Castles later consented to an irreconcilable differences divorce, agreed on all

issues related to custody of their three children, and agreed that the chancery court would

decide all issues related to the equitable distribution of the marital estate, alimony, child

support, and attorney's fees. After a three-day trial, the chancery court divided the marital

estate and awarded Mary an "equalization payment" of $584,608.41, lump-sum alimony of

$1,600,000, periodic alimony of $6,500 per month, and child support of $3,200 per month.

On appeal, Jason argues that the chancery court erred by classifying a house as a marital

asset. The house was intended to serve as the marital home but was still under construction

at the time of the separation, and Jason argues that it was his separate property.  Jason also argues that the awards of lump-sum alimony and periodic alimony are excessive.  After review of the record, we find the chancellor acted within his discretion.  Thus, we affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.    Mary and Jason married in 1999 in Tuscaloosa, Alabama.  At the time, Mary was twenty-three years old, and Jason was twenty-five.  During their marriage, the Castles had a son (born in 2001) and two daughters (born in 2002 and 2004).

¶3.    Prior to the marriage, Mary had finished one semester of community college and had worked at a daycare and as a clerk at a video rental store.  During the marriage, Mary was a stay-at-home mother and did not work outside the home.  The Castles' daughters both have dyslexia and attend regular tutoring outside of school.  The daughters also have health issues that require them to see out-of-town doctors.  In addition, all three Castle children are involved in extracurricular activities.

¶4.    Jason began working for his father in the pipeline industry when he was fifteen years old, and he went to work in the industry full-time when he was eighteen years old.  In the early years of the parties' marriage, Jason worked for several different pipeline construction companies operating heavy equipment.  Eventually he was promoted to foreman.  In 2005, Jason began working for his father's company, Progressive Pipeline Inc. (PPI), as a superintendent, and PPI later promoted him to construction manager.

¶5.    Jason's father, Mike Castle Sr., and two partners formed PPI in 1999.  PPI built

2

transmission pipelines throughout the southeastern United States. Eventually, Mike Sr. bought out his two partners.

¶6. In 2008, Mike Sr. formed Progressive Pipeline Holdings LLC (PPH), a holding company with seven subsidiaries. Mike Sr. created PPH for estate planning purposes because his three sons could not have afforded to purchase an interest in PPI. At the time it was formed, PPH had little or no book value because it had no significant assets or contracts. Mike Sr. gave Jason and another son, Mike Jr., each a twenty-percent non-voting interest in PPH. He gave his youngest son, Zachary, a ten-percent non-voting interest. Mike Sr. retained a fifty-percent voting interest.

¶7. In 2008 and 2009, PPI subcontracted many of its projects to PPH so that PPH could establish a work history, obtain bonding, satisfy state licensing requirements, and develop client relationships. By 2012, PPH had essentially taken over the operations of PPI. Jason worked as a construction manager for PPH. Between 2010 and 2015, Jason's reported earnings from salary and wages ranged from $148,620 to $214,575, with an average of about $180,000.

¶8. In addition to his base salary, Jason also received cash distributions from PPH. As the only voting member of PPH, Mike Sr. decides whether and when to make such distributions. Jason received cash distributions from PPH of $1,500,000 in 2012; $1,000,000 in 2014; and $2,000,000 in 2015. Jason's K-1 statements for those years show that his share of PPH's ordinary business income was $8,107,749 in 2012, $3,887,401 in 2013, $2,865,024 in 2014,

3

and $7,343,995 in 2015. PPH pays quarterly tax estimates for Jason based on his share of PPH's income. Jason's share of the PPH's income is reportable income to Jason. However, Jason has no legal right to insist on distributions from PPH. And most of Jason's PPH earnings remain with PPH as retained earnings subject to distribution by his father but nevertheless remaining Jason's property subject to distribution by Mike Sr. At trial, Mike Sr. testified that PPH would not make any distributions in 2016 because business had slowed due to a drop in oil prices. From the $22,204,169 credited to Jason's PPH account for 2012 through 2015, he received distributions totaling $4,500,000 in addition to the approximately $720,000 he received in salary for the four years leading up to and including the year of separation and filing for divorce.

¶9. Jason and Mary agreed to appoint Annette Herrin to appraise Jason's interest in PPH. Herrin is a certified public accountant, and she testified at trial as an expert in business valuation. Herrin testified that as of December 31, 2014, PPH's net value was $49,429,463, and PPH's net income for 2014 was $34,555,828. Herrin valued Jason's twenty percent non-voting interest in PPH at $5,930,000. Herrin testified that she discounted Jason's interest in the company because it was a closely-held family business controlled by Mike Sr.

¶10. In 2008, the Castles moved into a four-bedroom, three-bath home in Collinsville. In 2011, Jason and his brother Zachary formed Castle Holdings LLC to acquire 103.5 acres of land near Meridian, where they planned to build homes. Mike Sr. or PPI loaned Castle Holdings approximately $222,525, which covered most or all of the purchase price for the

land. Mike Sr. testified that he did not expect his sons to repay the loan and considered the money a gift.

¶11. Both Jason and Zachary built homes on the property. Jason first built a house at 209A Mt. Horeb Road (the 209A house). The 209A house is a two-bedroom, two-bathroom house with approximately 1,800 square feet. Jason and Mary agreed that the 209A house was worth $277,884. At trial, Mary referred to the 209A house as "the barn." She testified that they built the 209A house primarily to store "Jason's toys" and only intended to live in it a short time while they built their "forever home" nearby on the same property. The Castles moved into the 209A house in 2012, at which point they sold their Collinsville home for $365,000.

¶12. In May 2014, Zachary signed a warranty deed conveying 56.6 acres of the Castle Holdings property to Jason and Mary as joint tenants with full rights of survivorship. Jason testified that he did know about the conveyance until after Mary filed for the divorce. Zachary did not testify, and there is no explanation in the record as to why the property was conveyed from Castle Holdings to Jason and Mary at that time.

¶13. The same month that the property was conveyed to them as joint tenants, Mary and Jason began construction of a second home at 209B Mt. Horeb Road (the 209B house). The 209B house, which was intended to be the Castles' "forever home," is located only about 600 or 700 feet away from the 209A house. The 209B house is an 8,237-square-foot, three-story, five-bedroom, seven-bathroom house with an elevator. Mary and Jason agreed that the 209B

5

house is worth $1,500,000. Mary referred to the 209B house as "the castle."

¶14. Mary testified that she spent almost two years planning and designing the 209B house. According to Mary, she "picked out almost every detail of the whole house," modified some of the floor plan, and "made changes to [the] layouts of some of the rooms." Mary testified that she spent countless hours selecting brick, stone, cabinetry, carpet, tile, stains, lighting, hardware, bathroom finishes, and appliances for the home. She also designed an elaborate staircase in the home.

¶15. Mary testified that Jason chose some of the floors, the roof, and an air conditioner, designed a "safe room" for his guns, and helped design a bar area in the basement. However, Mary testified that she "did everything else" as far as designing the home. She testified she interacted with their contractor on an almost daily basis. Jason agreed that Mary helped to design the house, but he disapproved of many of her choices, which he considered extravagant. Originally, the account used to pay for construction of the 209B house was a joint account, and Mary wrote most of the checks for the construction. The account was funded with Jason's distributions from PPH.

¶16. In November 2014, Mary discovered that Jason was having an affair. The Castles separated because of Jason's affair. They briefly reconciled, but Mary later discovered that Jason had not ended the affair. They separated again, and in April 2015 Mary filed for divorce on the grounds of adultery or, in the alternative, irreconcilable differences.

¶17. In May 2015, the parties consented to an irreconcilable differences divorce. They

subsequently agreed to share joint legal custody of their three minor children, that Mary would have physical custody of all three children, and that Jason would have visitation pursuant to an agreed schedule. They also agreed that the chancery court would decide all issues related to child support, equitable distribution, alimony, and attorney's fees.

¶18. In May 2015, the chancery court entered an agreed temporary order. The parties agreed and the order provided that Jason would continue to pay the mortgage, insurance, taxes, and utilities on the 209A house; maintain health insurance for Mary and the children and pay all of their uninsured healthcare expenses; continue to pay a number of other expenses and bills for Mary and the children; and pay "temporary family support" of $1,000 per week to Mary. In March 2016, the temporary order was amended to increase the temporary family-support payment to $1,300 per week.

¶19. After the couple separated, Jason continued to live in the 209A house with Mary and the children until December 2015. Jason then moved into the "castle" at 209B in January 2016. Mary and the children never lived in that house.

¶20. A three-day trial on all remaining issues was held in August 2016. Jason admitted to the affair during trial. On December 20, 2016, the chancery court entered a memorandum opinion and final judgment, which granted the parties an irreconcilable-differences divorce and resolved all issues submitted to the court for decision.

¶21. The chancery court ruled that Jason's interest in PPH was non-marital property because it was essentially a gift to Jason from Mike Sr. For the same reasons, the court ruled

that distributions from PPH that Jason deposited in separate bank accounts were Jason's separate property. However, the court found that the 209B house was marital property. The court granted Jason the exclusive use and possession of the 209B house but awarded Mary twenty-five percent of its value in the equitable distribution of the marital estate.

¶22. Because the court awarded Jason substantially more marital property than Mary, the court ordered Jason to make an "equalization payment" to Mary of $584,608.41.[1] In addition, because Jason had significantly more separate property than Mary—consisting primarily of his interest in PPH—the chancery court awarded Mary lump-sum alimony of $1,600,000. The court stated that the equalization payment and lump-sum alimony would allow Mary to continue to stay at home with the couple's children, buy a home without a mortgage, and pay off her credit card debt. The court also awarded Mary permanent periodic alimony of $6,500 per month and child support of $3,200 per month.

¶23. Jason filed a timely motion for a new trial and reconsideration. He argued, among other things, that the court erred by classifying the 209B house as marital property and by awarding Mary an equalization payment, lump-sum alimony, and periodic alimony. He argued that no alimony was warranted or, in the alternative, that the amounts awarded were excessive. On February 9, 2017, the chancery court denied Jason's motion except to amend

---

[1] The chancery court determined that Mary should receive twenty-five percent of the value of the 209B house ($375,000) and fifty percent of the value of all other marital property ($397,787.22). The equalization payment was necessary because Mary received marital property with a total value of only $188,718.81. Jason received marital property with a total value of $2,107,021.63.

the payment schedule for lump-sum alimony.[2]  Jason then filed a timely notice of appeal.

**ANALYSIS**

¶24.  "When reviewing a decision of a chancellor, this Court applies a limited abuse of discretion standard of review."  *Mabus v. Mabus*, 890 So. 2d 806, 810 (¶14) (Miss. 2003). We "will not disturb the chancellor's opinion when supported by substantial evidence unless the chancellor abused his discretion, was manifestly wrong, clearly erroneous, or an erroneous legal standard was applied."  *Id.* at 819 (¶53).  However, "[a] chancellor's conclusions of law are reviewed de novo."  *Lowrey v. Lowrey*, 25 So. 3d 274, 285 (¶26) (Miss. 2009).

¶25.  We review the chancellor's equitable distribution of the marital estate "to ensure that the chancellor followed the appropriate standards and did not abuse his discretion."  *Inge v. Inge*, 227 So. 3d 1185, 1188 (¶8) (Miss. Ct. App. 2017) (quoting *McKnight v. McKnight*, 951 So. 2d 594, 596 (¶6) (Miss. Ct. App. 2007)).  Similarly, "[a]limony awards are within the discretion of the chancellor," and we will not reverse unless the chancellor's findings of fact are manifestly erroneous, the award is so inadequate or excessive as to be an abuse of discretion, or the chancellor "applied an erroneous legal standard."  *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

¶26.  As noted above, Jason argues that the chancery court erred by classifying the 209B

---

[2] The chancery court ordered Jason to make six semiannual payments $266,666.67, with the first payment due on June 15, 2017.

house as a marital asset. He also argues that the award of lump-sum alimony and periodic alimony were erroneous and excessive. We address these issues in turn below.

## I. The 209B House

¶27. "[W]hen dealing with property in divorce," the chancery court must first "determine what assets are marital and what assets are nonmarital." *Carter v. Carter*, 98 So. 3d 1109, 1112 (¶8) (Miss. Ct. App. 2012). Our Supreme Court has "define[d] marital property for the purpose of divorce as being any and all property acquired or accumulated during the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 915 (Miss. 1994). Such assets "are marital assets and are subject to an equitable distribution by the chancellor." *Id.* However, "[p]roperty acquired in a spouse's individual capacity through an inter-vivos gift or inheritance is separate property, even if such property is acquired during the marriage." *Rhodes v. Rhodes*, 52 So. 3d 430, 441 (¶40) (Miss. Ct. App. 2011).

¶28. "The law presumes that all property acquired or accumulated during marriage is marital property." *Stroh v. Stroh*, 221 So. 3d 399, 409 (¶27) (Miss. Ct. App. 2017). The party claiming that the asset is separate, nonmarital property has the burden of proof and must overcome the presumption that the asset is marital property. *Id.*; *Rhodes*, 52 So. 3d at 441 (¶42). After the chancery court determines whether each of the party's assets are marital or nonmarital, the court must apply the *Ferguson* factors to equitably divide the marital estate. *Carney v. Carney*, 201 So. 3d 432, 440 (¶27) (Miss. 2016).

¶29. In this case, the chancery court ruled that Jason failed to rebut the presumption that

the 209B house was marital property. On appeal, Jason argues that the 209B house was separate property because it was built on land that was originally purchased by Castle Holdings LLC with money that, in substance, was a gift from Mike Sr. In addition, the construction account was funded by Jason's distributions from PPH, which the chancery court deemed separate property. Finally, Jason emphasizes that the 209B house was not completed until after Mary filed for divorce, so Mary never lived in the home.

¶30. It is true that a "gift made to *one spouse* during the marriage remains the separate property of that spouse." *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶13) (Miss. Ct. App. 2011) (emphasis added). However, "[g]ifts may be made to either party to a marriage or to the marital union itself." *Henderson v. Henderson*, 757 So. 2d 285, 291 (¶26) (Miss. 2000). "Whether a gift was made to one or both spouses is determined by the donor's intent." Deborah H. Bell, *Mississippi Family Law* § 6.03[1][a], at 139 (2d ed. 2011). And, "absent clear proof otherwise," gifts to the marital union "are assets of the marital estate." *Henderson*, 757 So. 2d at 291 (¶26).

¶31. As discussed above, Jason and Zachary formed an LLC to acquire the property at issue, and the LLC subsequently conveyed the property to Jason and Mary as joint tenants with rights of survivorship. Jason claims that he was unaware that Zachary, acting on behalf of their LLC, conveyed the property to Mary and him. In any event, the formal titling of property is not determinative of its marital or separate character; the chancery court must determine whether, in substance, the property should be treated as marital or separate. *See*

11

*Rhodes*, 52 So. 3d at 437 (¶22).

¶32.    The evidence at trial showed that Jason acquired the property specifically because he and Mary planned to build their marital home on the property.  The Castles built the smaller 209A house as a temporary house, and the family lived there for over two years prior to the separation.  During that time, they began construction on the much larger 209B house, only 600 or 700 feet away from the 209A house.  The Castles never intended for the 209A house to be the permanent marital home and always intended to move into the 209B house as soon as it was finished.  Moreover, although Jason complained that Mary spent extravagantly on the design and furnishings of the 209B house, he acknowledged that Mary was extensively involved in the design and construction of the house.  There is no dispute that the 209B house would have been the marital home but for Jason's continued infidelity, which led to the breakdown of the marriage and the divorce.

¶33.    The chancery court found that the land on which the Castles built the 209B home was essentially "a gift from [Mike Sr.] through Castle Holdings[] LLC," and the land was conveyed to Mary and Jason as joint tenants with rights of survivorship in 2014, when the Castles had been married for over fourteen years.[3]  The court also found that "Mary and Jason jointly participated in the planning and designing of [the house] as their anticipated marital home."  The court acknowledged that the house was constructed using distributions

---

[3] The chancery court's opinion correctly stated that "title to the property does not determine the issue of marital or non-marital property."

12

from PPH, which the court deemed Jason's separate property, but the court found that "Mary contributed her time and effort in the construction of the house before construction started and after construction started." On these facts, the court found that "Jason failed to rebut the presumption that the [land and home] are marital property." Therefore, the court found that the 209B house was marital property subject to equitable distribution.

¶34. We cannot say that the chancery court clearly or manifestly erred by finding that the 209B house was marital property. To begin with, although Jason emphasizes that the land on which the house was built was essentially a "gift" from Mike Sr., that is not the end of the inquiry. The gift was made three years before the parties separated, and the clear purpose of the gift was to allow Jason *and Mary* to build a new home for their family. Under the circumstances, the chancery court properly treated the gift as a gift to the marital union, not as a gift of separate property to Jason alone. *See Watson v. Watson*, 882 So. 2d 95, 107-08 (¶¶61-65) (Miss. 2004) (holding that contributions of one spouse's parents to the marital home were "assets of the marital estate" "absent clear proof otherwise") (quoting *Henderson v. Henderson*, 757 So. 2d 285, 291 (¶26) (Miss. 2000)).

¶35. Moreover, it is clear that the parties *both* contributed time and efforts to the planning, design, and construction of the 209B house. The chancery court found that most or all of the funds used to build the house had been Jason's separate property; however, when Jason contributed those funds toward the construction of the marital home, the funds lost their separate character. *See Singley v. Singley*, 846 So. 2d 1004, 1011-12 (¶¶19-21) (Miss. 2002).

13

The chancery court had discretion to give Jason credit for his monetary contributions to the home, and the court exercised that discretion by awarding Jason seventy-five percent of the value of the home. *See id.* But the fact that the home was built with separate funds does not automatically make it separate property. *Stroh*, 221 So. 3d at 409 (¶30) (finding that a property was marital property even though it was purchased with separate funds).

¶36.    Finally, we agree with the chancery court that it is not dispositive that Mary never moved into the 209B house. Jason and Mary planned to move into the 209B house as their marital home, and Mary and the children lived in the 209A house—only 600 or 700 feet away—throughout the construction of the 209B house. The 209A house is on the same property as the 209B house, and it was only intended to serve as a temporary house for the family. It appears that the Castles planned that the 209A house would have served as a guest house or for storage of "Jason's toys" once the 209B house was complete. There is no dispute that the 209A house is marital property, and we see no reason that the adjacent 209B house should or must be treated differently.

¶37.    As stated above, we begin with a presumption "that all property acquired during marriage is equitable property." *Stroh*, 221 So. 3d at 409 (¶27). On the facts of this case, we cannot say that the chancery court clearly or manifestly erred by finding that Jason failed to rebut that presumption with respect to the 209B house.

## II.    Lump-Sum Alimony

¶38.    Jason next argues that the chancery court abused its discretion by awarding Mary

$1,600,000 in lump-sum alimony, payable in six semiannual installments of $266,666.67.

This Court recently summarized the characteristics and permissible purposes of an award of lump-sum alimony:

> Lump-sum alimony . . . is a fixed and irrevocable amount, used either as alimony or as a part of property division. It may be payable as a single, lump sum (as its name implies) or in fixed periodic installments. Lump-sum alimony has been described as a means of adjusting financial inequities that remain after property division. It is intended as an equalizer between the parties to serve equity amongst them *completely once and for all*. When lump-sum alimony is awarded as a mechanism to equitably divide the marital assets, then chancellors may conduct their analysis under the *Ferguson* factors. However, when a chancellor awards lump-sum . . . alimony *after* equitably dividing the estate, the chancellor should consider the *Armstrong* factors.

*Stroh*, 221 So. 3d at 413 (¶45) (citations, internal quotation marks, and brackets omitted).

¶39. In this case, the chancery court awarded lump-sum alimony in connection with the equitable distribution of marital assets and the "equalization payment" awarded to Mary. Thus, the chancery court appropriately considered the *Ferguson*[4] factors, as well as the *Cheatham*[5] factors. The chancery court found "that only an equalization payment of marital property [would be] inequitable and unreasonable" on the facts of this case. The court explained that, even after the equalization payment, the value of the marital assets distributed to Jason would greatly exceed the value of the assets distributed to Mary. In addition, the court emphasized that Jason had separate assets valued at $6,828,268.36, including his interest in PPH, bank accounts with combined balances of approximately $725,000, a boat,

---

[4] *Ferguson v. Ferguson*, 639 So. 2d 921, 928 (Miss. 1994).

[5] *Cheatham v. Cheatham*, 537 So. 2d 435, 438 (Miss. 1988).

15

a tractor, and other personal property. In contrast, Mary owned no material separate assets. The court found that the disparity in the parties' financial positions was "substantial" and that an award of lump-sum alimony would decrease, but not totally negate, the need for periodic alimony. The court further found that the equalization payment and an award of $1,600,000 in lump-sum alimony would "provide[] Mary with the opportunity to purchase the house of her choice for the price of her choice," "eliminate any monthly house mortgage (note) payment," and "provide Mary with monthly income even if she decide[d] to remain at home" with the Castles' three minor children.

¶40.  We find no manifest error or abuse of discretion in the chancery court's award of lump-sum alimony. Our Supreme Court has stated that when a chancery court considers a request for lump-sum alimony, "the single most important factor undoubtedly is the disparity of the separate estates." *Cheatham*, 537 So. 2d at 438; *accord, e.g.*, *McKissack v. McKissack*, 163 So. 3d 975, 982 (¶26) (Miss. Ct. App. 2015). The chancellor obviously considered this factor in his analysis. Under *Ferguson*/*Cheatham*, the chancellor also considered, among other factors, the length of the parties' marriage, Mary's lack of work experience outside the home, her lack of any present income, and her need for financial security. *See Cheatham*, 537 So. 2d at 438. The chancellor also properly found that an award of lump-sum alimony would reduce the need for periodic alimony. Based on the factors that the chancellor properly considered, the award of lump-sum alimony was not manifestly erroneous or an abuse of discretion.

16

¶41. Jason also argues that the award should be reversed because he will have to "sell everything" in order to make the equalization payment and lump-sum alimony payments ordered by the chancery court. We disagree, as there is substantial evidence that Jason can make these payments. To begin with, as noted above, Jason had over $725,000 in cash in separate bank accounts. In addition, in the four years prior to the divorce, Jason received a total of $4,500,000 in distributions from PPH. Jason argues that Mike Sr. determines whether to make distributions, and distributions could decrease or even stop due to market forces beyond his control. However, Jason received a distribution of at least $1,000,000 in each of three of the four years prior to the divorce, and PPH earned steady and significant profits from 2011 forward. Thus, it was reasonable for the chancery court to anticipate Jason would continue to receive distributions from PPH. Moreover, Jason now owns two unencumbered houses valued at $1,500,000 and $277,884, respectively, which he can borrow against. *See Inge*, 227 So. 3d at 1189-90 (¶¶14-15) ("[W]hen the marital home is unencumbered by a mortgage, the equity in the home may provide a means for one party [to make cash payments to the other]."). Jason also owns two boats, a motorcycle, three four-wheelers, two ATVs, a tractor and disc, and two retirement accounts. Given Jason's considerable assets and sources of income, there is substantial evidence that the payment schedule ordered by the chancery court is reasonable and within Jason's means.

### III.    Periodic Alimony

¶42. "In matters of equitable distribution and alimony, [an appellate court] enjoys only

17

limited powers of review. Chancellors are afforded wide latitude in fashioning equitable remedies in domestic relations matters, and their decisions will not be reversed if the findings of fact are supported by substantial credible evidence in the record." *Gutierrez v. Gutierrez*, 233 So. 3d 797, 806 (¶19) (Miss. 2017) (quoting *Henderson*, 757 So. 2d at 289-90 (¶19)).

¶43.    "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003). "When reviewing the reasonableness of an alimony award, an appellate court will 'consider the totality of the chancellor's awards upon the divorced parties, including the benefit to the payee spouse and the concomitant burden placed upon the payor spouse.'" *Arrington v. Arrington*, 80 So. 3d 160, 167 (¶23) (Miss. Ct. App. 2012) (quoting *Brooks v. Brooks*, 652 So. 2d 1113, 1121 (Miss. 1995)). It is well established that:

> The purpose of permanent alimony is to be a substitute for the marital-support obligation. The award of permanent periodic alimony arises from the duty of the husband to support his wife. *We also have said that the husband is required to support his wife in the manner to which she has become accustomed, to the extent of his ability to pay.* To update our language: Consistent with *Armstrong*, a financially independent spouse may be required to support the financially dependent spouse in a manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.

*Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011) (emphasis added).

¶44.    After awarding Mary an equalization payment and lump-sum alimony (totaling $2,184,608.41), the chancellor addressed Mary's request for periodic alimony. He analyzed post-divorce income and its sources available to both Jason and Mary, as well as the style of

18

living to which both he and Mary had become accustomed during their fifteen years together. In considering evidence relevant to the *Armstrong* factors, the chancellor found the following:

> Mary has represented her needs pursuant to the Exhibit 1 Expense Statement. She did not work outside the home after she and Jason married. Mary and Jason established a comfortable standard of living including the accumulation of marital property and an anticipated $1,500,000[] house. This standard of living for Mary was interrupted by Jason's inappropriate actions. The evidence does not develop any tax consequence, except that pursuant to income tax returns, alimony is an adjustment (deduction) for [Jason], and income for [Mary].

In Exhibit 1, Mary estimated that her post-divorce basic expenses would increase to nearly $11,000 a month. The chancellor found that the equalization payment and lump-sum alimony payment would "provide[] Mary with the opportunity to purchase the house of her choice for the price [o]f her choice and eliminate any monthly house mortgage (note) payment[,]" while also providing Mary with a monthly income, should she choose to stay at home. The chancellor also found, however, that Mary needed monthly periodic alimony to maintain her accustomed standard of living, particularly if $600,000 for purchase of an unencumbered house were removed from income-producing funds.

¶45. Mary's annual personal expenses, as reflected in her Rule 8.05 disclosure, total in excess of $128,000—including estimated down payments and monthly interest, tax, and other expenses for purchase of a home and maintenance of a reserve for emergencies rather than for a lump-sum purchase of a house. Toward those expenses and others consistent to the style of life to which she and the children have become accustomed, Mary will annually be

19

able expend alimony of $78,000 (less taxes), and the income (also less taxes), generated by her $2,184,608.41 cash-marital-property award. Marital personalty awarded to her is not productive of income and, most likely, will require her payment of insurance, maintenance, storage, and like costs. Safe investment of the cash award in certificates of deposit at two percent would produce, at most, $44,000. Further, as noted by the chancellor, under the tax law in effect when the final judgment was entered, Mary will be required to report and pay state and federal income taxes on the periodic alimony of $78,000 she receives while Jason may deduct the same $78,000 from his taxable income. The $78,000 he deducts should save him $34,788 in federal and state income taxes and should result in a net cost to him of $43,212, more or less, for years prior to 2018 and only 2.6 percent more in subsequent years.

¶46.    In comparing the financial circumstances in which the parties find themselves, and in considering the style of living to which they have become accustomed in context of whether or not a deficit exists, we note that Jason will be living in a $1,500,000 house while Mary will live, with their three children, in a house worth $600,000. Mary will be receiving payments that she is required to report to the Internal Revenue Service as income of $6,500 a month (but costing Jason $3,601 a month, more or less, after taxes). Jason's taxable income obligations, however, for the five years preceding their divorce were based on the average of a nearly *four million dollars a year* in taxable income,[6] with the majority of his

---

[6] The record contains Jason's 1040 tax forms for the years 2010 – 2014. His adjusted gross income for each year reflected earnings of $511,192 in 2010; $1,295,305 in 2011; $7,560,748 in 2012; $3,812,484 in 2013; $2,741,889 in 2014. The record does not contain

20

income taxes paid by PPH.

¶47. It is not difficult to understand how the chancellor recognized a deficit between Jason and Mary in their projected future ability to continue living in the style to which they became accustomed. For the foregoing reasons, we find the chancellor's alimony award was supported by substantial evidence in the record and well within his discretion.

¶48. **AFFIRMED.**

**LEE, C.J., GRIFFIS, P.J., BARNES AND WESTBROOKS, JJ., CONCUR. TINDELL, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION. GREENLEE, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION. WILSON, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY IRVING, P.J., CARLTON, GREENLEE AND TINDELL, JJ.**

**WILSON, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶49. I concur in Parts I and II of the lead opinion, which affirm the chancery court's finding that the 209B house is marital property and the chancery court's award of $1,600,000 in lump-sum alimony. I respectfully dissent as to Part III, which affirms an additional award of $6,500 per month in periodic alimony.

¶50. "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003). When we refer to a "deficit," we do *not* mean that one party is left with fewer assets or less income than the other. *Layton v. Layton*, 181 So. 3d 275, 282

Jason's 1040 form 2015, but his 2015 W-2 form reflected a gross pay of $200,062.94, and his 2015 Schedule K-1 form reflected a business income of $7,343,995.

(¶17) (Miss. Ct. App. 2015). "Rather, the question is whether the spouse seeking alimony is left 'with a deficit *with respect to having sufficient resources and assets to meet his or her needs and living expenses*.'" *Id.* (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). "If after the equitable distribution of the marital property, both parties have been adequately provided for, then an award of alimony is not appropriate." *Cosentino v. Cosentino*, 912 So. 2d 1130, 1132 (¶10) (Miss. Ct. App. 2005) ("*Cosentino I*").

¶51. Before considering Mary's request for periodic alimony, the chancery court awarded her a total of $2,184,608.41 in lump-sum payments, consisting of an "equalization payment" of $584,608.41 and lump-sum alimony of $1,600,000.[7] The court found that the equalization payment and lump-sum alimony would (1) allow Mary to purchase a $600,000 home without a mortgage and thereby "eliminate" any monthly mortgage payment; (2) enable Mary to pay off all of her credit card debt and thereby "eliminate" her monthly payments on that debt; and still (3) "provide Mary with monthly income even if she decides to remain at home." The court also found that "Mary was indefinite about the basis of some of [her remaining] estimated expenses." However, the court still found that Mary should be granted $6,500 per month in periodic alimony.

---

[7] The award of lump-sum alimony in this case should be viewed as part of the equitable distribution since it was based on the *Ferguson* factors, rather than the *Armstrong* factors, and preceded the court's consideration of periodic alimony. *See Davenport v. Davenport*, 156 So. 3d 231, 241 (¶34) (Miss. 2014).

¶52. Mary estimated post-divorce living expenses for herself alone[8] of $10,736 per month. However, Mary's estimate included both a monthly mortgage payment of $3,432 and credit card payments of $707 per month. As noted above, the chancery court specifically found that the equalization payment and lump-sum alimony would enable Mary to "eliminate" both of those expenses. Once those two expenses are eliminated, Mary's alleged expenses drop to $6,597 per month. To be clear, these are the total expenses that Mary claims—accepted at face value with no further reductions. In other words, this is the amount that *Mary herself* claimed was necessary to maintain the life "to which she has become accustomed." *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011).

¶53. In summary, the stated intent and practical effect of the chancery court's judgment was to allow Mary to buy a $600,000 home with no mortgage, pay off all of her other debt, and still have over $1,500,000 remaining and available to her. Nonetheless, the chancery court then made an additional award of periodic alimony ($6,500 per month) that—by itself—is essentially equal to Mary's remaining claimed living expenses ($6,597 per month).

¶54. The award of periodic alimony should be reversed and the case remanded for the same basic reasons that this Court reversed the award in *Cosentino*, *supra*. In *Cosentino*, the chancery court awarded the wife marital assets valued $2,615,815 *and* $7,000 per month in periodic alimony. *Cosentino I*, 912 So. 2d at 1131 (¶¶1-6). On appeal, this Court reversed

---

[8] Mary estimated additional expenses for the parties' children, but the chancery court ordered Jason to pay $3,200 per month in child support and maintain health and dental insurance for the children.

the award of periodic alimony because the chancery court did not adequately explain the reasons or need for alimony in light of the substantial assets awarded to the wife. *Id.* at 1132-33 (¶¶9-12). In remanding the case for further proceedings, we emphasized that "[i]f after the equitable distribution of the marital property, both parties have been adequately provided for, then an award of alimony is not appropriate." *Id.* at 1132 (¶9).

¶55. On remand in *Cosentino*, the chancery court again awarded $7,000 per month in periodic alimony. *Cosentino v. Cosentino*, 986 So. 2d 1065 (Miss. Ct. App. 2008) (*Cosentino II*). The husband appealed, and on appeal this Court again reversed, stating: "The chancellor did not address whether [the wife's] property settlement of more than two million dollars eliminated her need for alimony. The chancellor did not articulate any reason why [the wife] needed more than the $2,615,815 that she was awarded." *Id.* at 1068 (¶9). We emphasized that "alimony should be awarded only when the division of the marital estate leaves one party in a deficit," and we held that the chancery court's findings were insufficient to show that there was any deficit or need for an award of alimony. *Id.* We also stated that "the chancellor's finding that [the wife] 'could easily outlive' her share of the marital estate [was] speculative at best." *Id.* at 1069 (¶10). We stated that "[t]he proper question before the chancellor was whether [the wife] needed alimony at the time of the property division, not whether she [might] need it at some time in the future." *Id.* Therefore, we reversed *and rendered* the award of periodic alimony. *Id.*

¶56. Similar to *Cosentino*, the chancery court in this case "did not articulate any reason

why [Mary] needed more than the [$2,184,608.41] that she was awarded." *Cosentino II*, 986 So. 2d 1068 (¶9). The chancery court did not explain how the division of the marital estate, the equalization payment, and lump-sum alimony left Mary "in a deficit"—much less a "deficit" essentially equal to her claimed living expenses. *Id.* Stated differently, the chancery court did not consider that it had already awarded Mary "sufficient resources and assets to meet" a significant part, if not all, of her future "needs and living expenses." *Jackson*, 114 So. 3d at 777 (¶22). Here, Mary's "resources and assets" obviously include lump-sum alimony and the earnings on those funds,[9] but the chancery court's award of periodic alimony failed to account for those available resources. As in *Cosentino I*, we should reverse the award of periodic alimony and remand the case for further consideration of this issue, taking into account Mary's available resources and assets.

¶57. The above discussion analyzes the chancery court's decision on its own terms. The chancery court appropriately recognized that the equalization payment and lump-sum alimony would allow Mary to buy a $600,000 home with no mortgage and "eliminate" her

---

[9] Mary's available resources also include her own earning capacity. Mary did not work outside of the home during the marriage, she has limited work experience and no college degree or specialized training, and she is now a single mother to three children (ages fifteen, fourteen, and twelve at the time of the divorce). However, Mary was only forty years old at the time of the judgment, and the chancery court found that she is in good health. A vocational expert testified that, without additional training, Mary was qualified for positions that paid $8.85 to $12.68 per hour. He testified that, with additional training, she could earn more. The chancery court stated that the equalization payment and lump-sum alimony would "provide Mary with monthly income even if she decide[d] to remain at home." However, the chancery court did not make any findings as to the extent to which Mary could or should be expected to obtain employment at some point in the future.

25

high-interest credit card debt. This would reduce Mary's claimed expenses to $6,597 per month—and still leave her with at least $1,500,000 before the issue of periodic alimony is even considered.

¶58. In contrast, the lead opinion distorts the analysis of this issue by starting with the unwarranted assumption that Mary's annual expenses will "total in excess of $128,000." *Ante* at ¶45. The lead opinion arrives at this inflated figure by including both a $3,432 monthly mortgage payment and $707 in minimum monthly payments on credit card debts. But, as discussed above, the chancery court specifically found that Mary could "eliminate" both of those expenses when it awarded her an equalization payment and lump-sum alimony totaling $2,184,608.41. Nonetheless, and without giving any reason, the lead opinion assumes exactly the *opposite*—that Mary will have a $3,432 monthly mortgage payment. And the lead opinion further assumes that, even after receiving more than two million dollars in lump-sum payments, Mary will continue, month after month, to make only minimum payments on high-interest credit card debts.

¶59. In addition to inflating Mary's expenses, the lead opinion misapplies the concept of a "deficit" for purposes of alimony. The lead opinion finds "a deficit between Jason and Mary" by "comparing" their respective "financial circumstances." *Ante* at ¶¶46-47. The lead opinion states that "Jason will be living in a $1,500,000 house while Mary lives, with their three children, in a house worth $600,000." *Ante* at ¶46. But, as discussed above, Mary does not have a "deficit" just because Jason has a bigger house or a greater earning capacity. "If

26

the equitable division of property leaves neither spouse with a deficit *with respect to having sufficient resources and assets to meet his or her needs and living expenses*, then no alimony award is appropriate." *Jackson*, 114 So. 3d at 777 (¶22) (emphasis added). Any award of alimony must be based on the needs and living expenses of the spouse requesting it. If that spouse is "adequately provided for, then an award of alimony is not appropriate." *Cosentino I*, 912 So. 2d at 1132 (¶10). A court cannot award alimony solely because the payor is wealthy enough to pay it.

¶60. The judgment of the chancery court may not strike anyone as unjust. The parties consented to an irreconcilable differences divorce, but Jason's adultery appears to have been the cause. Moreover, Jason has been brought into a successful family business. If the business's past performance is any indication, Jason should be able to pay alimony of $6,500 per month without much difficulty. For these reasons, the result in this case may not stir feelings of outrage or great sympathy for Jason. However, under prevailing Supreme Court precedent, adultery and earning capacity are not a basis for awarding $6,500 per month in permanent alimony if the recipient spouse is already "adequately provided for." Therefore, I respectfully concur in part and dissent in part.

**IRVING, P.J., CARLTON, GREENLEE AND TINDELL, JJ., JOIN THIS OPINION.**