# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-CA-01338-COA

**JEFFREY H. DESCHER**                                                    **APPELLANT**

**v.**

**APRIL PUCHEU DESCHER**                                                  **APPELLEE**

DATE OF JUDGMENT:              08/22/2018
TRIAL JUDGE:                   HON. JAMES B. PERSONS
COURT FROM WHICH APPEALED:     HARRISON COUNTY CHANCERY COURT,
                               FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT:       DAVID ALAN PUMFORD
                               RICHARD ANTHONY FILCE
                               ERIK M. LOWREY
ATTORNEYS FOR APPELLEE:        JOE SAM OWEN
                               ASHLEY W. GUNN
NATURE OF THE CASE:            CIVIL - DOMESTIC RELATIONS
DISPOSITION:                   AFFIRMED - 01/14/2020
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**EN BANC.**

**LAWRENCE, J., FOR THE COURT:**

¶1.    On May 11, 2015, after seventeen years of marriage, April Descher filed a complaint for divorce against her husband, Jeffrey (Jeff) Descher. Two children were born of the marriage. Before a trial began in March 2017, April and Jeff consented to a divorce based on irreconcilable differences. The parties agreed to allow the chancellor to decide the distribution of the marital property, child custody and custodial child support, and the appropriateness of alimony, among other disputes submitted to the chancellor for resolution.

¶2. Jeff either owned by himself or co-owned with his brother thirteen McDonald's restaurants across the Mississippi Gulf Coast and southern Alabama, along with an apartment complex, a car wash, and a commercial building. This resulted in a profitable and sizable marital estate that was accumulated during the course of the marriage. The chancellor valued the marital estate and found that alimony was appropriate. As a result, the chancellor awarded April lump sum alimony in the amount of $856,794.98 and permanent periodic alimony in the amount of $7,500 per month. The chancellor further ordered Jeff to pay $7,500 per month in child support and to pay the children's college expenses. In addition, the chancellor ordered Jeff to purchase a one million dollar life insurance policy with the two children listed as the sole beneficiaries. Jeff now appeals the award of child support, college expenses, and the life insurance requirement, along with the chancellor's decision to award April permanent periodic alimony. We find that the chancellor equitably distributed the vast marital estate and did not commit manifest error in awarding lump-sum alimony, requiring the payment of child support and college expenses, requiring life insurance for the children's benefit, and awarding permanent periodic alimony. For the reasons set forth below, we affirm the decision of the chancellor.

**FACTS**

¶3. April Descher filed a complaint for divorce in 2015. The parties consented to an irreconcilable-differences divorce on February 15, 2017. The consent decree asked the chancellor to determine the issues raised in April's original complaint, absent the grounds

2

for divorce. The issues determined by the chancellor that are relevant to this appeal were child support and any related expenses, college tuition, life insurance, and permanent periodic alimony.

¶4. Throughout their marriage, the Deschers built a sizeable marital estate. The marital estate came from Jeff's ownership interest in numerous businesses including thirteen McDonald's restaurants, an apartment complex, a car wash, and a commercial building. April was not listed as an owner on any of the businesses acquired during the marriage.[1] The record shows that at the time of trial Jeff's ownership interests, along with the estimated valuation of those interests by the court appointed expert,[2] were as follows:

1.	The business BGJ, LLC owns an office complex building. Jeff owned a 33.33% interest along with his brothers Gregg Descher and Dr. Bill Descher. Jeff's interest was valued at $208,000 at trial.

2.	The business C2J, LLC owns a car wash. Jeff owned a 50% interest with Joshua Rimes. At the time of trial, the value of Jeff's interest was $0.[3]

---

[1] As discussed more fully below, due to McDonald's corporate structure April was not authorized by McDonald's to own a McDonald's restaurant.

[2] The chancellor appointed an expert in business evaluations to determine the value of the many business entities Jeff owned. Exhibit thirty-one, a document provided by the expert concerning the business valuations, was entered into evidence by April through her attorney without objection. The expert was not called to testify at trial, and any confusion or concerns about the values of the various businesses were not resolved at trial.

[3] The court-appointed expert determined Jeff's interest in the car wash owned by C2J LLC was $0. That business owns real property and, in 2016, had a profit of $50,453. Under the present law, because of expenses and liabilities, the car wash had a $0 valuation for purposes of determining the value of the marital estate. Again, those valuations were not questioned by the parties, and there is no evidence that the valuations did not comply with current law.

3

3.	Big D owns 100% of nine subsidiary companies and the apartment complex (Green Tree Apartments). Jeff and his brother Gregg each owned a 50% interest. Each of the nine subsidiary companies owned and operated eleven businesses: (1) Fourteen D owns two McDonald's stores; (2) Fifteen D owns one McDonald's store; (3) Sixteen D owns one McDonald's store; (4) Seventeen D owns one McDonald's store; (5) Eighteen D owns two McDonald's stores;[4] (6) Nineteen D owns one McDonald's store; (7) Twenty D owns one McDonald's store; (8) Twenty-One D owns one McDonald's store. The total of Jeff's interests in all of these businesses was valued at $68,300 at trial.[5]

4.	Four D is not a subsidiary of Big D and owns one McDonald's store. Jeff owns a 50% interest in Four D. At trial, Jeff's valued interest was $251,000.

5.	Five D is not a subsidiary of Big D and owns one McDonald's store. Jeff owns a 50% interest in Five D. Jeff's valued interest at trial was $710,000.

6.	Six D is not a subsidiary of Big D and owns one McDonald's store. Jeff owns a 50% interest in Six D. His valued interest at trial was $152,000.

---

[4] The chancellor noted in his amended judgment that "after the Agreed Temporary Order was entered, Jeff and his brother, Gregg, terminated operations of one of the Big D restaurants, owned by Eighteen D, and opened another store under the Twenty-Two D business." This was done after the valuations listed above were completed for trial. The chancellor found that this did not "[have] a material effect on the marital estate subject to equitable distribution." But the $500,000 used to assist in opening the new McDonald's, as discussed more fully below, certainly could have.

[5] As stated previously, the business Big D owns ten different McDonald's stores. Jeff owns 50% of Big D, and those stores were acquired during the course of the marriage. The court-appointed expert, following the present law, determined that ten McDonald's stores plus an apartment complex was only valued at $68,300. In essence, the ten McDonald's stores and the apartment complex were valued at $68,300 for purposes of the marital estate. Yet Big D reported a net profit of $941,000 in 2016. Further, Twelve D, which only owns one McDonald's store, was valued at $912,000 because it had lesser loan liabilities. Under the present state of our law on how a business is valued for purposes of the marital estate, the Big D valuation certainly affected the equitable distribution of the marital estate.

4

7. Twelve D is not a subsidiary of Big D. Jeff is the sole owner of Twelve D, which owns and operates one McDonald's store. His valued interest at the time of trial was $912,000.

The total sum of Jeff's interests in all of the businesses he acquired during the marriage was valued at $2,301,300.

¶5. April worked for the Descher business conglomerate. She was responsible for monogramming the uniforms of the corporation's employees, handling gift certificates, and addressing customer complaints at any of the thirteen restaurants.[6] April testified that she worked as an assistant at Benefield Eye Care before her marriage and as a sales clerk during high school. Otherwise, April has only worked for the Descher family. The chancellor found that April's yearly income was $36,288, with an adjusted gross income of $2,491.25 per month. Her Rule 8.05 financial statement listed $12,784.82 in her personal monthly expenses and $3,402.33 in expenses for the two children, for a total of $16,168.33 in monthly expenses.[7] Because April would receive the home and her vehicle free and clear of any debt, this left her personal monthly expenses at $7,199.50 per month.

¶6. Jeff's Rule 8.05 statement listed his monthly income before taxes as $65,931.33. Further, his Rule 8.05 listed his after-tax monthly income at $40,986.34. However, during his questioning by April's attorney, it was proved that these figures were not accurate. Jeff

[6] The chancellor's findings of fact indicate that April and Jeff were both employed and paid through Ten D and Twelve D. Ten D, owned by Jeff's parents, serves as a payroll entity for the Descher business organization that owns twenty McDonald's restaurants on the Mississippi Gulf Coast. Jeff is the sole owner of Twelve D.

[7] UCCR 8.05.

5

and his accountant reduced his actual before-tax income by claiming section 179 pass-through expenses,[8] which are tax deductions for business expenses in the type of corporations that Jeff had set up. While those expenses may be tax deductible, they are still income for the purpose of evaluating child support and alimony. For example, Jeff claimed $500,000, which was actually income for Big D, in pass-through deductions as expenses for opening a new McDonald's restaurant after his separation from April. That $500,000 deduction was used to reduce Big D's net-profit income by $500,000. In other words, Big D's 2016 net-profit was $941,198, but Jeff deducted $500,000 from that $941,198 as a business deduction for the new McDonald's. That $500,000 was still income for Jeff and his brother and was used to open a new business. Just because it was classified as a deduction on his tax returns does not mean that it was not income for the purposes of child support and alimony. There were numerous other deductions as well. The chancellor added all of the deductions Jeff used to reduce his before-tax income on his Rule 8.05 statement and instead of arriving at the number suggested by Jeff ($65,931.33), the chancellor found that the actual before-tax monthly income for Jeff was $96,316.66. The chancellor then reduced that figure by the taxes owed and concluded that Jeff's after-tax monthly income was not $40,986.34 (as stated in his Rule 8.05 statement), but, in fact, was $71,377.67. This is the monthly income the chancellor used in evaluating child support and alimony.

¶7.    The chancellor found that it was in the best interest of the minor children for April to

---

[8] 26 U.S.C. § 179 (2018).

6

retain physical custody. Jeff was ordered to pay $7,500 in child support each month until the oldest child reached age twenty-one, married, or was otherwise emancipated. In addition, the chancellor determined that Jeff was responsible for the cost of the children's private or public college education and related expenses, along with any health and medical expenses. Jeff was also ordered to obtain a one million dollar life insurance policy that named the children as beneficiaries to ensure that the support would continue if Jeff prematurely died.

¶8.     The chancellor then valued the entire marital estate in an effort to determine an equitable distribution. The judgment indicates that the chancellor was thorough in his distribution of the marital estate. As a result of the distribution, April received the marital home, valued at $625,000, and a 2016 GMC Denali, both of which would be free and clear of any indebtedness once Jeff paid the loans in total, as ordered. Further, April received $45,500 (from the sale of a Yellowfin boat) and her personal property. Jeff received his full interests in all the above-listed business entities, $45,500 from the sale of the Yellowfin boat, a 1984 Toyota Land Cruiser, and his personal property. The chancellor found that the total marital estate was valued at $3,584,766.75. The initial distribution of the marital estate, which included the marital home valued at $620,000, left April with a total value of $732,113.47 and Jeff with a total value of $2,445,703.42. The chancellor found that after the distribution, April had a deficit of $856,794.98 when compared with Jeff's portion of the estate. The chancellor therefore awarded lump-sum alimony in that amount. Finally, the chancellor ordered Jeff to pay April $7,500 a month in permanent-periodic alimony. The

7

chancellor concluded, "April's equitable distribution share of the marital estate is non-income producing[,]" and April was entitled to live at the standard to which she had become accustomed. Jeff now claims the chancellor erred in the award of monthly child support in the amount of $7,500 and college expenses. Finally, Jeff asserts that the one million dollar life insurance obligation was excessive and that April should not receive monthly permanent-periodic alimony in the amount of $7,500 because her expenses do not exceed that income.

## STANDARD OF REVIEW

¶9.     This Court's review of matters of divorce, child support, and alimony are limited. *Ferguson v. Ferguson*, 639 So. 2d 921, 930 (Miss. 1994). In fact, we may only overturn the findings of a chancellor if "the chancellor was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied." *Id*. (quoting *Bell v. Parker*, 563 So. 2d 594, 596-97 (Miss. 1990)). Any legal conclusions of the chancellor are reviewed de novo. *See Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).

## ANALYSIS

### I.     *Child Support*

¶10.     Based on April's Rule 8.05 financial statement, the children have estimated monthly expenses of $3,402.33. That sum includes $1,208.33 in health and dental insurance and other out-of-pocket medical expense, which the chancellor ordered Jeff to pay. Following the chancellor's order, the children's total estimated monthly expense would be $2,194 per month. The chancellor awarded a total of $7,500 in monthly child support. Jeff claims that

8

the award is excessive because the children's stated expenses are less than half of what the chancellor ordered. Additionally, Jeff claims that the chancellor erred because he did not make a "specific finding" to support the award as required by Mississippi Code Annotated section 43-19-101(4) (Rev. 2015).

¶11. The statute indicates that for two children the chancellor could award twenty percent of the parent's adjusted gross income (AGI) for support. *Id.* § 43-19-101(1). Where the parent makes more than $100,000 annually, however, the chancellor may deviate from the statutory guidelines by making a "written finding in the record as to whether or not the application of the guidelines . . . is reasonable." *Id*. § 43-19-101(4). An upward deviation by the chancellor of a child-support obligation may be valid if the increase provides for the children in a manner in which they have become accustomed. *Crittenden v. Crittenden*, 129 So. 3d 947, 959 (¶42) (Miss. Ct. App. 2013).

¶12. The chancellor found that Jeff's adjusted net income was $71,377.67 per month or $856,532.04 per year. That amount would have produced a monthly child-support obligation of $14,274.33 if the chancellor had applied the statutory guidelines in subsection 43-19-101(1). The chancellor made a downward deviation of under twenty percent in Jeff's favor. Jeff, however, still complains to this Court that the amount is too much.

¶13. This Court has previously rejected "the argument that equates reasonable support with subsistence" and adopted the view that "the 'reasonable needs' of the child ought to be viewed at least as broadly as the reasonable needs of a wife seeking alimony." *Ali v. Ali*, 232

9

So. 3d 770, 777 (¶21) (Miss. Ct. App. 2017). The monthly expenses provided for in a party's Rule 8.05 financial statement do not set a cap on an award of child support. Even if a child's basic needs are met, "[i]t is not an abuse of discretion for the chancellor to consider the standard of living to which the child is accustomed in deciding what amount of support is reasonable." *Ali*, 232 So. 3d at 777 (¶21) (citing *Moulds v. Bradley*, 791 So. 2d 220, 228-29 (¶24) (Miss. 2001) (Diaz, J., concurring)). Even though April claimed less than $4,000 in monthly expenses for the children, her Rule 8.05 declaration did not cap out the maximum amount of child support the chancellor could grant. Jeff's monthly income and his earning potential far surpass April's. As Justice Diaz said in his concurring opinion in *Moulds*, "[t]he trial court should not limit the amount in child support to the child's 'shown needs,' because a child is not expected to live at a minimal level of comfort while the non-custodial parent is living a life of luxury." *Moulds*, 791 So. 2d at 229 (¶26) (Diaz, J., concurring) (citing *People ex rel. Graham v. Adams*, 608 N.E.2d 614, 616 (Ill. App. Ct. 1993)). The Rule 8.05 financial statement is not a locked-in-time child support determination. The children were accustomed to a standard of living where their father made $71,377.67 per month. They are now living on $7,500 per month.

¶14. This Court is not a finder of fact, nor do we apply our own discretion in place of the chancellor's. The chancellor issued a thirty-two page judgment that clearly articulated his findings of fact from the evidence presented and the correct legal standards. This Court only reverses the decision of a chancellor if his decision is not supported by the record, results in

10

manifest error, or is an abuse of discretion. Here, the chancellor's award of child support is supported by the record, and his decision was not manifest error, nor an abuse of discretion.

## II.    College Support and Related Expenses

¶15.    Jeff next argues that it was manifest error to require him to be obligated for all of the children's college tuition and related expenses. The chancellor's judgment stated in part:

> Jeff shall be responsible for the reasonable cost and expense of both [the children's] college or university education, to include tuition, room and board, meals, laboratory fees, books, sorority or fraternity dues and expenses, automobile expenses, and any other cost generally associated with attendance at a four-year public or private college or university, either in-state or out-of-state. . . .

Jeff believes that this exposes him to an endless list of expenses that are unforeseeable. Additionally, Jeff argues the chancellor erred and failed to consider a reduction of his child support obligation once the children enter college.

¶16.    The Mississippi Supreme Court has held that the chancery court may require a parent to pay for college tuition and expenses "when a [parent's] financial ability is ample to provide a college education and the child shows an aptitude for such. . . ." *A.M.L. v. J.W.L.*, 98 So. 3d 1001, 1020 (¶54) (Miss. 2012) (quoting *Saliba v. Saliba*, 753 So. 2d 1095, 1101 (¶21) (Miss. 2000)). This authority, however, is not absolute and should be taken on a case-by-case basis "dependent upon the proof and circumstances [presented]." *Saliba*, 753 So. 2d at 1102 (¶24).

¶17.    Jeff first claims that because the chancellor failed to set a dollar amount on the award of college support and because the judgment did not require that the children attend an in-

11

state college or university, he is open to insurmountable costs that the chancellor could not properly consider at the time of the trial. Jeff cites the supreme court's holding in *A.M.L.* and claims that the law requires the chancellor make what Jeff describes as "specific findings on the record to support an award for expenses." In *A.M.L.*, however, the supreme court remanded the case for the chancellor to make a specific determination of what college expenses were required only because the chancellor had noted in her order that "[a]ll other aspects of the college expenses as set out in the original [Agreement] shall remain in full force and effect." *A.M.L.*, 98 So. 3d at 1021 (¶¶57-58). In this case, the chancellor was specific as to the exact expenses that Jeff was required to fulfill. Further, Jeff acknowledged that he had already created trust funds for the children's college education.

¶18. More in line with the facts of this case is the holding in *Saliba v. Saliba*, in which the supreme court determined that a father was required to pay for college expenses for his daughter even if the child chose an out-of-state college or university. *Saliba*, 753 So. 2d at 1103 (¶27). The court noted that when a parent is financially able, a child "is entitled to attend college in accord with [the child's] family standards." *Id*. at 1102 (¶27) (emphasis omitted) (quoting without reference *Rankin v. Bobo*, 410 So. 2d 1326, 1329 (Miss. 1982)) (citing *Wray v. Langston*, 380 So. 2d 1262 (Miss. 1980)). The Mississippi Supreme Court reasoned that David Saliba was wealthy and able to provide a college education to any institution his daughter chose. *Id*. at 1103 (¶27). Specifically, the supreme court stated that "[the father] is able and should be required to contribute to the college education at an

12

institution of his daughter's choice, commensurate with her parents' station in life." *Id*.

Based on the record before this Court, Jeff is more than able to provide his children with collegiate education "commensurate with [their] parents' station in life" and, in fact, has already set up and partially funded college-expense trust funds for the children.

¶19. While Jeff argues that the chancellor failed to make a detailed finding regarding whether the college-expense support obligation minimizes his child support obligation, the laws of this State say differently: "payments toward education are seldom used to offset child support 'as they do not diminish the child's need for food, clothing and shelter.'" *Weeks v. Weeks*, 29 So. 3d 80, 88 (¶34) (Miss. Ct. App. 2009) (quoting *Fancher v. Pell*, 831 So. 2d 1137, 1142 (¶23) (Miss. 2002)). There is no guarantee that the children will not live with April during the summer or at any other time when their respective universities are closed for the holidays, meaning that April will need to provide food and maintain the home, among other things.

¶20. Jeff preemptively argues for a modification of his child support obligation before the children are of the age to go to college. "To obtain a modification in child support payments, there must be a 'substantial and material change in the circumstances of one of the interested parties arising subsequent to the entry of the decree sought to be modified.'" *McEwen v. McEwen*, 631 So. 2d 821, 823 (Miss. 1994) (quoting *Gillespie v. Gillespie*, 594 So. 2d 620, 623 (Miss. 1992)). Jeff earns $71,377.67 per month after taxes and now owns either a half or full interest (without a split for the marital estate) in thirteen McDonald's restaurants, an

apartment complex, a car wash, and an office complex; he is certainly capable of paying future college expenses without causing a financial hardship. Jeff has also added a new McDonald's restaurant to his portfolio since April filed for divorce. The record is silent as to any material change that Jeff may have suffered at this point or how the payments of college expenses would be a financial hardship on Jeff, especially considering that the children had college-expense trust funds established before the divorce. Therefore, the chancellor did not commit manifest error in obligating Jeff to pay for his children's college expenses.

### III.    Life Insurance

¶21.    At the time of the divorce, the parties had two children. The children's standard of living was based on Jeff's adjusted monthly income of $96,316.66 and adjusted net income of $71,377.66. The chancellor determined that instead of the twenty percent required by the guidelines set forth in section 43-19-101(4), the children would receive a lesser amount of child support of $7,500 per month. To ensure the support obligation, the chancellor ordered Jeff should purchase and maintain a one million dollar life insurance policy for the benefit of the two children and their continued support. Jeff claims that the life insurance order was erroneous, too burdensome, and without a legal foundation. We disagree.

¶22.    In cases of divorce, an insurance policy that benefits the children is considered an issue of child support. *Arthur v. Arthur*, 691 So. 2d 997, 1001 (Miss. 1997) (citing *Brennan v. Brennan*, 638 So. 2d 1320, 1325 (Miss. 1994); *Nichols v. Tedder*, 547 So. 2d 766, 769

14

(Miss. 1989)). This Court has held that "[a]n alimony payor may be required to maintain life insurance in the amount sufficient to satisfy payment of alimony obligations that survive the payor's death." *Coggins v. Coggins*, 132 So. 3d 636, 644 (¶35) (Miss. Ct. App. 2014) (internal quotation marks omitted) (quoting Deborah H. Bell, *Mississippi Family Law* § 9.08[4][c], at 274 (1st ed. 2005)). The same can be said for child support obligations. In fact, ensuring the payment of child support in the event of the payor's death seems a far more laudable goal.

¶23. The life insurance policy protects the children and the anticipated support obligation if their paying parent prematurely dies. At the time of the trial, the oldest minor child was fourteen years old. That amounts to seven additional years of support at $45,000 per year. The youngest child was eleven at the time of trial. That child would have ten additional years at $45,000 per year of expected future support. Those two figures added together amount to a future support obligation of $765,000 for the children's support and benefit. If Jeff died before that potential future child support was fully paid, the children would lose that support. Factoring in the future college expenses to be paid, health insurance, or medical expenses to be paid and the $765,000 in future child-support obligations, a one million dollar life insurance policy to guarantee the support for the children was not an abuse of discretion.

¶24. The chancellor's order requiring Jeff to provide a one million dollar life insurance policy to ensure continued support of the parties two minor children is affirmed.

    IV.    *Permanent Periodic Alimony*

15

¶25.   Finally, Jeff argues that the chancellor erred by awarding April permanent periodic alimony.  "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Castle v. Castle*, 266 So. 3d 1042, 1053 (¶43) (Miss. Ct. App. 2018) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003)), *cert. denied*, 267 So. 3d 278 (Miss. 2019).  This Court is bound to "consider the totality of the chancellor's awards upon the divorced parties, including the benefit to the payee spouse and the concomitant burden placed on the payor spouse." *Id.* (internal quotation marks omitted) (quoting *Arrington v. Arrington*, 80 So. 3d 160, 167 (¶23) (Miss. Ct. App. 2012)).  "Our scope of review of an alimony award is familiar and well settled.  Alimony awards are within the discretion of the chancellor, and his discretion will not be reversed on appeal unless the chancellor was manifestly in error in his finding of fact and abused his discretion."  *Coggins*, 132 So. 3d at 640 (¶8) (quoting *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993)).

¶26.   Permanent periodic alimony serves an important purpose as a "substitute for the marital-support obligation." *Rogillio v. Rogillio*, 57 So. 3d 1246, 1250 (¶11) (Miss. 2011). More specifically,

> [t]he award of permanent periodic alimony arises from the duty of the husband to support his wife.  **We have also said that the husband is required to support his wife in a manner to which she has become accustomed, to the extent of his ability to pay.**  To update our language: Consistent with *Armstrong*, a financially independent spouse may be required to support the financially dependent spouse in a manner in which the dependent spouse was supported during the marriage, subject to a material change in circumstances.

16

*Castle*, 266 So. 3d at 1053 (¶43) (emphasis altered) (quoting *Rogillio*, 57 So. 3d at 1250 (¶11)). This duty, however, is not absolute. A spouse that seeks alimony must have "a deficit with respect to having **sufficient resources and assets to meet his or her needs** and living expenses." *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013) (emphasis added).

¶27. Without a periodic alimony award, April would have been forced to draw on her lump-sum award for the rest of her life.[9] That is not a "sufficient resource" that *Jackson* anticipated. *Id*. April still worked for the Descher corporation at the time of trial. The most money she ever earned was when she worked for the Descher corporation. According to her Rule 8.05 statement, when April worked at the Descher corporation, she earned $3,024.00 before taxes. After taxes, April earned $2,491.25. She listed $12,784.82 in total personal monthly expenses. In addition, her children's expenses were listed as $3,402.33 each month. Because she received the home and her vehicle free and clear of any debt, April no longer has a mortgage payment or a car note in her monthly expenses. That means April's personal

---

[9] The dissent argues that the chancellor did not consider April's $856,794.98 lump-sum alimony award as part of her "resources and assets" available to meet her expenses. *Post* at (¶46). The chancellor, however, specifically stated that "[i]n view of the significant income disparity following the equitable distribution of the marital estate, the lack of April having any meaningful potential future earnings potential, the length of the marriage, the parties' accustomed standard of living, and the [c]ourt finding that it would be inequitable to require April to live exclusively off of the moneys she is to receive as the lump-sum alimony portion of the equitable distribution of the marital assets . . . this [c]ourt finds that April is entitled to an award of periodic alimony." That indicates the chancellor did in fact consider the lump-sum alimony award as an asset.

17

monthly expenses, after the chancellor's judgment, was $7,199.50. Jeff, on the other hand, was able to attend what McDonald's calls "Hamburger University" and as a result qualified to own and manage McDonald's restaurants. The businesses he now owns are free and clear of any interest April held. Those businesses bring in over thirty-one million dollars per year in gross revenue. While the lump-sum alimony award was $856,794.98, which is certainly a large sum to most people, it does nothing to cure the fact that there is still a "significant income disparity" between Jeff's and April's incomes from the businesses, which were portions of the marital property. Jeff earns over $71,000 per month after taxes. April earns $2,491.25 per month after taxes if she is even still employed with the Descher business conglomerate. The lump-sum alimony award did not address this obvious income disparity.

¶28.    The question now becomes whether $7,500 per month in permanent periodic alimony is excessive. Excessive awards of alimony by the chancellor have been overturned by this Court before. In *Cosentino v. Cosentino*, 912 So. 2d 1130 (Miss. Ct. App. 2005) (*Cosentino I*), this Court held that the wife was not entitled to $7,000 in permanent periodic alimony. *Id*. at 1131 (¶1). This Court reversed and remanded the case to the chancery court for a proper *Ferguson* and *Armstrong* analysis.[10]  *Id*. at 1133 (¶12). When Douglas Cosentino again appealed the chancellor's decision after remand, we reversed and rendered judgment

---

[10] *Ferguson v. Ferguson*, 639 So. 2d 921, 926 (Miss. 1994) (finding that awards of alimony are appropriate if after dividing the marital property there is still inequity between the two parties); *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280-81 (Miss. 1993) (noting the twelve factors necessary for a chancellor to consider when entering a judgment for alimony).

18

for failure to justify the permanent periodic alimony award when the wife had received $2,615,815 as part of the marital estate. *Cosentino v. Cosentino*, 986 So. 2d 1065, 1066 (¶¶1-3) (Miss. Ct. App. 2008) (*Cosentino II*). The instant case is distinguishable from our decisions in *Cosentino I* and *Cosentino II*.

¶29.    In *Cosentino II*, we found that the chancellor's failure "to provide any justification for the alimony award" was error. *Id.* at 1068 (¶8). Since "[t]he chancellor did not articulate any reason why Phyllis [Cosentino] needed more than the $2,615,815 that she was awarded," this Court found that there was no evidence of a reasonable need for additional alimony. *Id.* at (¶9). Here, however, the record supports the chancellor's finding that additional, permanent periodic alimony was necessary. The chancellor noted in his amended judgment that "April's equitable distribution share of the marital estate [was] non-income producing" and that "even under the best of circumstances [any potential investment income] is not assured and pales in total insignificance when compared to the income historically received by Jeff." The chancellor continued:

> In view of the significant **income disparity** following the equitable distribution of the marital estate, the lack of April having any meaningful future earning[] potential, the length of the marriage, the parties' accustomed standard of living, and the [c]ourt finding that **it would be inequitable to require April to live exclusively off the moneys she is to receive as the lump-sum alimony portion of the equitable distribution** of marital assets while Jeff receives $65,913.33 in monthly gross income[11] from his share of

---

[11] This figure is taken from Jeff's Rule 8.05 statement and is not the recalculated, adjusted after-tax income that the chancellor found to be $71,377.66 per month. It is not clear why the chancellor resorted to $65,913.33 for purposes of this paragraph when he

19

the marital estate, the [c]ourt finds that April is entitled to an award of periodic alimony.

(Emphasis added). The chancellor was not manifestly wrong in making this factual determination and did not abuse his discretion in addressing this obvious disparity.

¶30. This Court's recent holding in *Castle* is more analogous to the instant facts. When distributing the marital property in *Castle*, the chancellor found that the husband was at a greater benefit than the wife. *Castle*, 266 So. 3d at 1048 (¶22). To make the parties equitable the chancellor awarded the wife a "equalization payment" of $584,608.41. *Id*. On top of that, the chancellor also awarded lump-sum alimony in the amount of $1,600,00.00 and $6,500.00 a month in permanent periodic alimony. *Id*. This Court upheld the full award because "it [was] not difficult to understand how the chancellor recognized a deficit between [the husband] and [the wife] in their **projected future ability to continue living in the style to which they became accustomed**." *Id*. at 1054 (¶47) (emphasis added).

¶31. The same can be said in this case. The chancellor specifically stated that the share of marital property awarded to April was non-income producing. More importantly, the record indicates that thirteen of the fourteen McDonald's restaurants that Jeff owns were acquired during the marriage. Jeff admitted this in the following testimony:

Q. All of the entities described on Exhibit C -- excuse me, 30, on

---

found the correct figure to be $71,377.66. Be that as it may, either figure (the one used by the chancellor in this paragraph or the corrected, recalculated figure as determined by the chancellor) showed a vast disparity in income between the parties from the marital businesses.

Plaintiff's Exhibit 30 that's admitted into evidence, starting with No. 1 through No. 7 were acquired during your marriage to April?

A.    That's correct.

"The law presumes that all property acquired or accumulated during marriage is marital property." *Id.* at 1049 (¶28) (quoting *Stroh v. Stroh*, 221 So. 3d 399, 409 (¶27) (Miss. Ct. App. 2017)). "Assets acquired or accumulated during the course of a marriage are subject to equitable division unless it can be shown by proof that such assets are attributable to one of the parties' separate estates prior to the marriage or outside the marriage." *Hemsley v. Hemsley*, 639 So. 2d 909, 914 (Miss. 1994). "Alimony and equitable distribution are distinct concepts, but together they command the entire field of financial settlement of divorce. Therefore, where one expands, the other must recede." *Ferguson v. Ferguson*, 639 So. 2d 921, 929 (Miss. 1994). Truly, "the issues of property division and alimony are intertwined." *Ali v. Ali*, 232 So. 3d 770, 774 (¶8) (Miss. Ct. App. 2017) (internal quotation marks omitted) (citing *McKissack v. McKissack*, 45 So. 3d 716, 723 (¶41) (Miss. Ct. App. 2010)).

¶32.    If this Court were to agree with Jeff and reverse on the permanent-periodic alimony award, April would be forced to live off the lump-sum alimony award and potentially run the risk of eventually running out of funds from the lump-sum payment, while Jeff would continue to earn an estimated $71,377.67 in after-tax income each month. As the chancellor noted in his judgment,

> April and the children are entitled to maintain their accustomed standard of living and the [c]ourt has attempted from the record before it not to go beyond what it believes is necessary [to] assure their accustomed standard of living.

21

> The [c]ourt further notes that Jeff's income permits him to pay these sums and to continue his accustomed standard of living.

Every month of every year until he sells his interest in the businesses or dies, Jeff will make income from the thirteen McDonald's restaurants and other businesses acquired during the marriage. April will make nothing. While Jeff draws income permanently, April would be forced to live on the dwindling lump-sum alimony if the chancellor had not awarded permanent periodic alimony.

¶33. The dissent complains that "Jeff's substantial income is not, by itself, a sufficient basis for the chancery court's award of $7,500 per month in permanent alimony." *Post* at (¶48). Jeff's "substantial income," however, is part of, and derived from, the businesses acquired and formed during the marriage as part of the marital estate. The chancellor noted this fact in his findings of fact, and the parties agreed that it was true. Despite the fact that those assets and businesses were acquired during the course of the marriage, Jeff never associated April's name with any of those assets or businesses. As a result of the divorce, April received $7,500 per month to alleviate the "significant income disparity" that the chancellor found to exist. The award of permanent periodic alimony was not based solely on April's expenses or Jeff's substantial income. The chancellor's findings of fact with regard to the permanent periodic alimony are clearly articulated based on the evidence presented and are in accordance with the correct legal standards.

¶34. Finally, the dissent argues the chancellor abused his discretion in not considering April's assets acquired after the divorce when he awarded her $7,500 per month in permanent

22

periodic alimony.  A review of Jeff's income versus his monthly expenses indicates Jeff's monthly income after taxes was $71,377.67.  Jeff listed his Rule 8.05 monthly expenses at $24,829.11.  At trial, Jeff admitted that $10,000 of that $24,928.11 in monthly expenses was actually paid by one of the Descher corporations he owned.  Therefore, his actual out-of-pocket monthly expenses is $14,829.11.  After his taxes and monthly expenses are paid, Jeff still has $56,548.56 left over each and every month as a result of the income produced by the businesses created during the marriage.  The chancellor ordered Jeff to pay $7,500 a month in child support and $7,500 a month in permanent periodic alimony.  After Jeff pays that court-ordered child support and alimony, as well as his monthly expenses, Jeff still has $41,548.56 left over each and every month.  On the contrary, April has personal monthly expenses in the amount of $7,199.50 and presently collects $7,500 in alimony. Therefore, Jeff has $41,548.56 left over while April has $300.50 left over each month from the businesses that were part of the marital estate.[12]  The chancellor attempted to lessen this disparity by his award of permanent periodic alimony coupled with the lump-sum alimony and the division of the marital estate.  That finding by the chancellor is supported by the record and does not appear excessive or to be an abuse of discretion.  Therefore, the order of alimony is affirmed.

---

[12] This figure does not include the children's expenses or the child support payment of $7,500 that Jeff was ordered to make each month. Further, this figure would not include any other expenses that April does not have if she is still employed by the Descher corporation.

## CONCLUSION

¶35.    During their marriage, Jeff and April Descher accumulated an immense fortune based off of Jeff's interest in numerous business ventures.  The record illustrates the chancellor considered the facts and the laws of this State before he rendered an in-depth judgment.  The chancellor noted that Jeff had the means to financially provide April and the children the lifestyle to which they had become accustomed.  Notably, Jeff never argued his inability to pay and provide any of the financial support that he claims in this appeal.  Instead, Jeff argues the chancellor was wrong in the amount of his determinations.  We find no evidence to support that claim.   For the foregoing reasons, we find that the award of child support along with college tuition and related expenses for the children was supported by substantial evidence.  Furthermore, this Court finds that the decision to require Jeff to maintain a one million dollar life insurance policy for the benefit of the children and permanent periodic alimony for April were well within the chancellor's discretion and are affirmed.

¶36.    **AFFIRMED.**

    **BARNES, C.J., CARLTON, P.J, GREENLEE, WESTBROOKS, McDONALD AND McCARTY, JJ., CONCUR.  J. WILSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION, JOINED BY C. WILSON, J.   TINDELL, J., NOT PARTICIPATING.**

    **J. WILSON, P.J., DISSENTING:**

¶37.    I would hold that the chancellor abused his discretion by ordering Jeff to pay April child support that bears no relationship to the actual cost of supporting the children.  I would also hold that the chancellor abused his discretion by awarding April permanent alimony that,

24

by itself, exceeds her own claimed expenses, with no allowance for her earning capacity or the substantial assets that she received in the divorce. On those grounds, I would reverse and remand the case for further proceedings, and I respectfully dissent.

## I. Child Support

¶38. The chancellor ordered Jeff to pay April $7,500 per month in child support for the couple's two children, then thirteen and fifteen years old. In addition, Jeff was ordered to pay health insurance premiums, deductibles, co-pays, and other out-of-pocket medical expenses for the children.

¶39. April submitted a signed Rule 8.05 financial statement showing the expenses that she claimed, both for herself and on behalf of her children. April testified under oath that her 8.05 statement was "true and correct to the best of [her] ability." April's 8.05 statement lists expenses for the children totaling $3,402.33 per month. However, those expenses include $1,208.33 per month for health and dental insurance and out-of-pocket medical expenses. The final judgment now requires Jeff to pay all of those expenses in addition to his base child support obligation. Therefore, according to April's 8.05 statement, her ongoing expenses for the children are $2,194 per month.

¶40. The chancellor abused his discretion by ordering Jeff to pay child support to April in an amount that bears no articulable relationship to the actual cost of supporting their two children. "Noncustodial parents pay child support to custodial parents for the benefit of the child, not the parent . . . ." *Brewer v. Holliday*, 135 So. 3d 117, 120 (¶14) (Miss. 2014). Yet

25

the judgment requires Jeff to pay April child support that is more than three times the amount of the children's expenses claimed by April in her 8.05 statement. April points to nothing in the record to explain what the $5,306 in surplus child support would be used to pay. That is, there is no explanation as to how it will be used to "support" either of the children. A chancellor has substantial discretion in setting child support, *Williams v. Williams*, 264 So. 3d 722, 726-27 (¶12) (Miss. 2019), and I have no doubt that it is within the chancellor's discretion to provide a reasonable cushion over and above the children's actual present expenses. However, the award in this case goes far beyond that. There is nothing in the record to show that the amount of child support ordered has any relationship to the actual "support" of the children.

¶41. The majority suggests that the award should be affirmed because it represents a "downward deviation" from the guidelines. *Ante* at (¶12). However, "[t]he presumption that the guidelines are correct does not apply to payors with yearly adjusted income . . . over [$100,000]." Deborah H. Bell, *Mississippi Family Law* § 13.06, at 442 (2d ed. 2017). Rather, in such cases, the chancellor "shall make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable." Miss. Code Ann. § 43-19-101(4) (Rev. 2015). In addition, in all cases, "the statutory guidelines are just that, guidelines[.]" *Burnham v. Burnham*, 185 So. 3d 358, 361 (¶11) (Miss. 2015). Regardless of how much money Jeff makes, the amount that the court orders him to pay to April *for child support* must have some basis in the actual cost of the children's "support."

26

The order was an abuse of discretion because it has no such basis in the evidence.[13]

## II.    Alimony

¶42.    "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003). When we refer to a "deficit," we do not mean that one party is left with fewer assets or less income than the other. *Layton v. Layton*, 181 So. 3d 275, 282 (¶17) (Miss. Ct. App. 2015). "Rather, the question is whether the spouse seeking alimony is left 'with a deficit with respect to having sufficient resources and assets to meet his or her needs and living expenses.'" *Id.* (emphasis omitted) (quoting *Jackson v. Jackson*, 114 So. 3d 768, 777 (¶22) (Miss. Ct. App. 2013)). "If after the equitable distribution of the marital property, both parties have been adequately provided for, then an award of alimony is not appropriate." *Cosentino v. Cosentino*, 912 So. 2d 1130, 1132 (¶9) (Miss. Ct. App. 2005).

¶43.    In this case, as part of the equitable division of the marital property, the chancellor awarded April the marital home, valued at $625,000, and ordered Jeff to pay off the mortgage, which had a balance of $406,949.86. The chancellor also awarded April a vehicle, valued at $70,000, and ordered Jeff to pay off the note, which had a balance of $41,492.

---

[13] The majority asserts that "[t]he children were accustomed to" a higher "standard of living" before Jeff and April separated but "are now living on" only $7,500 per month. *Ante* at (¶13). However, there is nothing in the record to show that a $7,500 per month payment from Jeff to April is needed to maintain the children's pre-divorce "standard of living." Moreover, Jeff was awarded liberal visitation and, like most non-custodial parents, will continue to spend money on and in support of his children in addition to his court-ordered support obligation.

27

April also received $56,000 cash from the sale of a fish camp, a $42,500 cash payment from Jeff for her share of the equity in a boat, and bank accounts with a combined balance of $8,613.47. Finally, the chancellor awarded April lump-sum alimony of $856,794.98.[14]

¶44. On her 8.05 statement, April claimed total expenses for herself of $12,784.82 per month. This figure included a monthly mortgage payment of $4,885.32 and a monthly car payment of $700. As noted above, the chancellor ordered Jeff to pay off the mortgage and car note in full, which eliminates those monthly expenses. Therefore, based on April's 8.05 statement, her personal ongoing monthly expenses are $7,199.50.

¶45. As to April's income, the chancellor stated that her employment history in Jeff's businesses[15] would "not qualify her for employment with earnings sufficient to maintain the lifestyle comparable to that which she now has." While it may be that April cannot earn *enough* to support her present lifestyle, that is not a reason to disregard her ability to work entirely. April was forty-three years old and in good health at the time of the divorce, she has an associate degree from Gulf Coast Community College, and she had worked as an assistant in an ophthalmologist's office prior to her employment in Jeff's businesses. Given April's

---

[14] The judgment required Jeff to pay $156,794.98 within ninety days and the remaining $700,000 in monthly installments of $8,000, with the outstanding balance to accrue interest at a rate of three percent. The judgment also imposed an "equitable lien" on Jeff's business interests until he paid the lump-sum award in full. Jeff has now paid the lump-sum award in full in order to release the equitable lien.

[15] April testified that during the marriage she worked forty hours a week for various McDonald's entities. April was still employed by those entities at the time of trial, and she testified that no one had threatened to terminate her employment; but she also testified that she did not want to continue to work for Jeff's businesses.

28

age and the fact that she worked throughout the parties' marriage, there is no reason to assume that she will not return to some form of employment and earn *some* income, even if it is not sufficient by itself to meet her present expenses.

¶46. The chancellor also stated that "it would be inequitable to require April to live exclusively off" of her lump-sum alimony. However, at the very least, it is appropriate to consider the reasonable income on the $856,794.98 as part of the "resources and assets" that will be available "to meet [April's] needs and living expenses." *Jackson*, 114 So. 3d at 777 (¶22). The chancellor's analysis did not do so.

¶47. In short, the chancellor awarded April permanent periodic alimony that, by itself, exceeds her own claimed expenses—with no allowance for April's own earning capacity or the substantial lump-sum alimony and other assets that she received in the divorce. This was an abuse of discretion because April's own earning capacity and lump-sum alimony are part of her "resources and assets" that are available "to meet . . . her needs and living expenses.'" *Id.* Accordingly, the chancellor's award of periodic alimony went well beyond addressing any "deficit" within the meaning of our precedent. *Layton*, 181 So. 3d at 282 (¶17).

¶48. On the issue of periodic alimony, this case is similar to *Castle v. Castle*, 266 So. 3d 1042 (Miss. Ct. App. 2018), *cert. denied*, 267 So. 3d 278 (Miss. 2019). I dissent for the same basic reasons that I dissented in that case, which was decided in relevant part by an evenly

29

divided Court.[16] As in *Castle*, I would reverse and remand the case for reconsideration of periodic alimony based on April's assets and earning capacity.[17] *Castle*, 266 So. 3d at 1056-57 (¶56) (Wilson, J., dissenting) (discussing *Consentino*, *supra*). Under prevailing Supreme Court precedent, Jeff's substantial income is not, by itself, a sufficient basis for the chancery court's award of $7,500 per month in permanent alimony. The "deficit" that an award of periodic alimony may address is *not* the disparity in incomes between Jeff and April. Rather, it is the difference between April's income and resources and her needs and expenses. *Id.* at 1057-58 (¶¶59-60).

## CONCLUSION

¶49. The awards of child support and alimony should be reversed, and the case should be remanded for further proceedings.[18] I respectfully dissent.

**C. WILSON, J., JOINS THIS OPINION.**

---

[16] The majority says that it follows our "holding in *Castle*," *ante* at (¶30), but there was no relevant holding in *Castle* because the Court was evenly divided on the issue of periodic alimony. *See Beecham v. State*, 108 So. 3d 394 (Miss. 2012) (holding that the decision of an evenly divided Court has no precedential value).

[17] The majority says that if the chancellor had awarded *no* periodic alimony, then "April would be forced to live on the dwindling lump-sum alimony" and "potentially run the risk of eventually running out of funds . . . ." *Ante* at (¶32). I agree that the chancellor had discretion to award periodic alimony. However, the *amount* awarded was an abuse of discretion because it fails to take into account April's assets and earning capacity. Therefore, the case should be remanded for reconsideration of the amount.

[18] On remand, the chancery court would have discretion to adjust all financial aspects of the judgment, including the division of marital assets and lump-sum alimony. *See Duncan v. Duncan*, 815 So. 2d 480, 484-85 (¶16) (Miss. Ct. App. 2002).