# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00629-COA

**LIDIA YOYBE SIERRA BAIRD**                     **APPELLANT**

**v.**

**COLIN LANE LOWRY BAIRD**                     **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 04/30/2024 |
| TRIAL JUDGE: | HON. TIFFANY PIAZZA GROVE |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | WILLIAM STACY KELLUM III |
| ATTORNEYS FOR APPELLEE: | MARTY CRAIG ROBERTSON MATTHEW STANLEY EASTERLING MANDALIN LOVE BLANTON SARAH HUNTER DIDLAKE |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED - 10/21/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE CARLTON, P.J., McDONALD AND EMFINGER, JJ.**

**CARLTON, P.J., FOR THE COURT:**

¶1. Lidia Yoybe Sierra Baird (Yoybe) appeals from the judgment of the Hinds County Chancery Court, which granted her and Colin Baird a divorce, determined child custody and visitation, divided and distributed their marital property, and awarded alimony. On appeal, Yoybe asserts the following assignments of error: (1) the chancellor improperly prioritized keeping the siblings together over the children's best interests; (2) the chancellor erred in her classification of certain marital assets; (3) the chancellor's alimony award was grossly inadequate; (4) the chancellor abused her discretion by denying Yoybe's motion for a continuance; (5) the chancellor abused her discretion by requiring Yoybe to pay Colin's

attorney's fees and a portion of the guardian ad litem's (GAL) fees pertaining to abuse allegations; and (6) the GAL failed to perform his mandatory function under Mississippi Code Annotated section 93-5-23 (Rev. 2021).

¶2. After our review, we find no error. We therefore affirm the chancellor's judgment.

## FACTS

¶3. Yoybe and Colin were married in 2002. During the marriage, Colin worked outside of the home, and Yoybe stayed home to raise the children. The parties had five sons: Adam, born in 2004; Ben, born in 2006; James, born in 2008; Nolan, born in 2016; and Eli, born in 2018.[1]

¶4. Yoybe homeschooled the children until approximately 2020, when Colin enrolled Adam, Ben, and James in school. Around that same time, the parties started sleeping in separate bedrooms.

¶5. In June 2021, Yoybe filed for divorce. Two months later, Yoybe moved out of the marital home and took the youngest two children (Nolan and Eli) with her. Colin and the three older children (Adam, Ben, and James) remained in the marital residence in Clinton, Mississippi.

¶6. In September 2021, the chancellor held a temporary hearing on the issues of custody and support. The record reflects that Adam, Ben, and James executed affidavits of parental selection pursuant to Mississippi Code Annotated section 93-11-65(1)(a) (Rev. 2021), expressing their desire to live with Colin. After the hearing, the chancellor entered a

_____

[1] We use fictitious names for the minor children in the interest of their privacy.

temporary order granting Colin legal and physical custody of all five children. The chancellor granted Yoybe visitation with the two oldest children—Adam and Ben—on the second and fourth Sundays of each month and with the three younger children—James, Nolan, and Eli—on the first, third, and fifth weekends of each month.

¶7. The chancellor granted Colin possession of the marital residence and ordered Colin to pay Yoybe $7,500 from the sale of the parties' rental house to aid Yoybe in establishing a separate residence. Yoybe eventually moved into a two-bedroom, one-and-a-half-bath townhome in Clinton. The chancellor also ordered Colin to pay Yoybe alimony in the amount of $1,500 per month.

¶8. In January 2022, Colin filed a motion to modify the temporary order based on a physical altercation that had occurred between Yoybe and James during Yoybe's visitation period. The record reflects that Yoybe contacted law enforcement after she left visible scratches on James, who was approximately thirteen years old at the time. The chancellor modified Yoybe's visitation period with James to Sunday afternoons (with his two older brothers) in a public place.

¶9. In May 2022, the chancellor entered an order appointing attorney Andrew Sorrentino as the GAL. The chancellor continued the trial to allow the GAL to fully investigate and issue a recommendation as to the type of custody and visitation that would be in the best interests of the children.

¶10. In October 2022, the parties filed a consent for the chancellor to adjudicate certain matters. The parties stated that they agreed to an irreconcilable differences divorce and

3

requested the chancellor to decide the issues of custody, visitation, child support, division of marital assets, alimony, and attorney's fees.

¶11. In March 2023, the GAL issued his report. The GAL recommended that it was in the children's best interests for Colin to be awarded physical custody of the five children, with Yoybe to have extended periods of visitation with the two younger children, Nolan and Eli. The GAL found that Nolan and Eli were "very close" with both parents, while Adam, Ben, and James "[we]re not close with their mother at all." The GAL expressed concerns with Yoybe's rigid style of discipline. He also found it troubling that Yoybe wanted the siblings separated and for the two younger boys, Nolan and Eli, to reside with her.

¶12. A trial was held in April 2023. Over the course of three days, the chancellor heard testimony from Colin, Yoybe, Adam, Ben, James, and Yoybe's friend Cynthia. Yoybe clarified that she was seeking sole physical custody only of the parties' two younger children, Nolan and Eli. On April 14, 2023, the chancellor entered an order continuing the trial to June 16, 2023.

¶13. On June 12, 2023, a few days before the trial was set to resume, Yoybe contacted the Clinton Police Department and reported possible sexual abuse involving two of her children. Yoybe alleged that the abuse had occurred back in January 2022.[2] The chancellor held a shelter hearing on June 22, 2023, and ultimately found Yoybe's abuse allegations to be unsubstantiated. The chancellor then ordered the trial on the merits to resume on October 2, 2023. The chancellor also ordered Yoybe to submit to a psychological evaluation prior

---

[2] We will discuss this allegation in full later in our analysis.

4

to the resumption of the trial.

¶14. The trial resumed on October 2, 2023, and the chancellor heard testimony from the parties and the GAL.

¶15. On April 30, 2024, the chancellor entered her final judgment granting the parties a divorce. After conducting an *Albright* analysis,[3] the chancellor awarded Colin sole legal and physical custody of the five children and granted Yoybe visitation with Nolan and Eli. The chancellor also divided and distributed the marital assets; awarded Yoybe alimony in the amount of $1,000 per month for six months; ordered Yoybe to pay $275 per month in child support; and ordered Yoybe to pay Colin $10,000 in attorney's fees and seventy percent of the GAL fees related to the unsubstantiated abuse claim.

¶16. Yoybe now appeals.

**STANDARD OF REVIEW**

¶17. "This Court has a limited standard of review in domestic relations cases[.]" *Bryant v. Bryant*, 364 So. 3d 865, 868 (¶8) (Miss. Ct. App. 2021). When "review[ing] a chancellor's findings of fact, particularly in the areas of divorce, alimony[,] and child support, this Court will not overturn the chancellor's decision on appeal unless his findings were manifestly wrong." *Id*.

**DISCUSSION**

I. ***Albright* Analysis**

¶18. Yoybe first argues that in the chancellor's *Albright* analysis, the chancellor gave

---

[3] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

improper weight to the preference to keep the five siblings together. According to Yoybe, the chancellor failed to consider the best interests of Nolan and Eli when evaluating the following *Albright* factors: continuity of care prior to separation; employment of the parents and responsibilities of that employment; emotional ties between parent and child; and stability and home environment and employment of each parent. Yoybe asserts the evidence at trial showed that prior to the temporary order awarding Colin custody of all five children, Yoybe was the main caretaker for Nolan and Eli and had a close emotional relationship with them. Yoybe therefore maintains that the chancellor should have found that these *Albright* factors were either neutral or favored Yoybe.

¶19. In child custody cases, "the polestar consideration . . . is the best interest and welfare of the child." *Albright*, 437 So. 2d at 1005. "To determine the best interest of the child, Mississippi courts are guided by the factors set forth in *Albright*." *Martin v. Martin*, 282 So. 3d 703, 708 (¶16) (Miss. Ct. App. 2019). The *Albright* factors are as follows:

> (1) age, health and sex of the child; (2) determination of the parent that had the continuity of care prior to the separation; (3) which has the best parenting skills and which has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) physical and mental health and age of the parents; (6) emotional ties of parent and child; (7) moral fitness of the parents; (8) the home, school and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.

*Tilley v. Gibbs*, 387 So. 3d 64, 71-72 (¶6) (Miss. Ct. App. 2024). "[W]e review the chancellor's application of the *Albright* factors for abuse of discretion, giving deference to the weight [s]he assigned each factor." *McLellan v. McLellan*, 397 So. 3d 860, 867 (¶27)

6

(Miss. Ct. App. 2024). On appeal in a child-custody case, this Court does not reweigh the *Albright* factors. *Sanders v. Sanders*, 281 So. 3d 1043, 1050 (¶21) (Miss. Ct. App. 2019). Rather, we review the evidence and testimony presented at trial to ensure the chancery court's ruling was supported by credible evidence. *Id.*

¶20. Our review of the final judgment shows that the chancellor performed a thorough *Albright* analysis and addressed each applicable factor. The chancellor found the following factors to be neutral: the age of the children; continuity of care prior to separation; willingness and capacity to provide primary childcare; and the home, school, and community record of the child. The chancellor found the following factors to favor or slightly favor Colin: the health and sex of the minor children; the parties' parenting skills; the employment of the parents and responsibilities of that employment; the physical and mental health and age of the parents; emotional ties between parent and child; moral fitness of the parents; child's preference (only for Adam, Ben, and James); and the stability of the home environment and employment of each parent.

¶21. When addressing the "other factors relevant to the parent-child relationship," the chancellor considered Yoybe's request to separate the siblings into two units, with Colin to have custody of the three older boys and Yoybe to have custody of the two younger boys. The chancellor recognized that "there is a strong preference in Mississippi law for keeping siblings together unless unusual circumstances justify their separation" and ultimately found no circumstances warranting the separation of the siblings in this case. After conducting her *Albright* analysis, the chancellor awarded Colin legal and physical custody of the five

7

children, with visitation for Yoybe.

¶22. On appeal, Yoybe suggests that the chancellor should have given more weight to the evidence and testimony from the time frame prior to the entry of the September 2021 temporary order. The temporary order, which was entered approximately a year and a half before trial, awarded Colin legal and physical custody of all five children and granted Yoybe visitation with the three youngest children. Both parties testified that approximately a year before the entry of the temporary order, the parties were living in separate rooms within the marital residence. During this time, Colin primarily cared for the three oldest boys, and Yoybe primarily cared for Nolan and Eli. The chancellor acknowledged this testimony in her final judgment.

¶23. The transcript reflects that at trial, the chancellor heard evidence and testimony about the children's physical and emotional health, school and community record, as well as each parties' parenting style, mental and physical health, home environment, employment, and continuity of care from the time periods before and after the entry of the temporary order. *See Copeland v. Copeland*, 904 So. 2d 1066, 1076 (¶39) (Miss. 2004) (finding that the time between separation and trial should also be considered when determining continuity of care in child-custody cases). Our review of the chancellor's judgment shows that in conducting her *Albright* analysis, the chancellor properly considered the evidence and testimony from the time periods before and after the entry of the temporary order. *See Jerome v. Stroud*, 689 So. 2d 755, 759 (Miss. 1997) (finding error when a chancellor failed to determine custody under all the facts and circumstances and limited his review to the constricted present

8

circumstances).

¶24. The record also supports the chancellor's finding that no unusual circumstances warranted separating the siblings. At trial, Yoybe claimed that it was in Nolan and Eli's best interest for them to be separated from their siblings due to "[s]afety, physical safety, protection from bad habits, bad attitudes." Yoybe also referenced the age difference between the three older children and the two younger children. In her final judgment, the chancellor addressed Yoybe's claims of abuse, parental alienation, and neglect by Colin and found these claims to be unsubstantiated. After our review, we find that evidence in the record supports the chancellor's determination that no unusual circumstances existed warranting the separation of the siblings.

¶25. We further find no merit to Yoybe's assertion that the chancellor prioritized keeping the five siblings together over Nolan's and Eli's best interests. The preference for keeping siblings together "should not override a child's best interest in a custody determination"; however, this Court has held that "the non-separation of a child from his or her siblings is usually in a child's best interest." *Owens v. Owens*, 950 So. 2d 202, 212 (¶35) (Miss. Ct. App. 2006). In the final judgment, the chancellor repeatedly acknowledged that the best interest of the child controls in custody determinations, and we find that the chancellor properly kept the children's best interests as her polestar consideration. The chancellor found that Nolan and Eli had close emotional ties with both parents. The chancellor also found that the three older boys previously had close relationships with Yoybe until they reached the age of eight or nine years old. The chancellor explained the trial testimony showed that "[o]nce

9

[the boys] get older, [Yoybe] loses the ability to effectively parent." The chancellor expressed "serious concerns" with the testimony regarding Yoybe's "inappropriate physical discipline" and "excessive rigidity in her discipline style." The chancellor acknowledged that Yoybe had denied allegations about inappropriate discipline, but the chancellor found that the claims were substantiated at trial. The chancellor ultimately found that Yoybe's "overly authoritative parenting style, coupled with her inability to be self-reflective, makes [Colin's] parenting style and ability preferred." The chancellor observed that Colin "makes actual attempts to connect with the children, support them emotionally, and give them a safe space to speak." The chancellor also found that Nolan and Eli "seem to be thriving in their school environment."

¶26. After our review, we find that the record contains substantial credible evidence to support the chancellor's custody determination.

## II.    Classification of Assets

¶27. Yoybe next argues that the chancellor abused her discretion in classifying the parties' assets, which resulted in an unfair division of the marital property.

¶28. In Mississippi, there is "a general presumption that property acquired during a marriage constitutes marital property." *Allgood v. Allgood*, 62 So. 3d 443, 447 (¶12) (Miss. Ct. App. 2011). To rebut this presumption, "the burden of proof is on the spouse claiming property as a separate asset." *Dean v. Dean*, 304 So. 3d 156, 166 (¶33) (Miss. Ct. App. 2020). Here, Yoybe claims that Colin failed to meet his burden of proving that 79 acres of real property in Utica, Mississippi, and Colin's company, Baird Engineering, are his separate

properties.  Yoybe argues that because Colin failed to meet his burden of proof as to these two properties, the chancellor abused her discretion in determining that they were separate property.  When reviewing a chancellor's division of property and assets, the chancellor's findings "will be upheld if it is supported by substantial credible evidence." *Owen v. Owen*, 928 So. 2d 156, 160 (¶10) (Miss. 2006).  This Court is "restrained from substituting our own judgment for that of the chancellor, even if we disagree with his or her findings of fact and would arrive at a different conclusion." *McDonald v. McDonald*, 115 So. 3d 881, 886 (¶14) (Miss. Ct. App. 2013).

### A.    Land in Utica

¶29.    At trial, Colin claimed that the 79 acres of real property owned by Baird Land Development LLC was his separate property.  Colin testified that after his father died in 2011, his mother created Baird Land Development and purchased the 79 acres.  Colin explained that his mother purchased the property with the money she received from his father's estate, and she listed Colin as a member of Baird Land Development "as a gift." Colin submitted a 2012 bank statement and a settlement statement for the 79 acres into evidence.  The bank statement reflected a withdrawal made by his mother for the purpose of purchasing the property, and the settlement statement reflected a purchase price of $200,000.

¶30.    We recognize that "[i]nter vivos gifts and inheritances are considered nonmarital property unless they have been commingled."  *McDonald*, 115 So. 3d at 885-86 (¶12). "However, assets which are classified as nonmarital, such as inheritances, may be converted into marital assets if they are commingled with marital property or utilized for domestic

11

purposes, absent an agreement to the contrary." *Id.* (internal quotation mark omitted).

¶31. At trial and on appeal, Yoybe argues that the 79 acres is marital property because Baird Land Development was created during the marriage, and the property was purchased during the marriage. During the trial, Yoybe was questioned about her knowledge of the 79 acres. Yoybe answered that she "believe[d] that is a place where they have caught beavers, and I believe there's a camper there, and it's just land." Yoybe admitted that she had "no idea" how the property was obtained. When the chancellor commented that the property was purchased with money Colin inherited, Yoybe responded, "That's what he said, but I never saw any proof[.]"

¶32. Yoybe also claims two of her sons testified that they had spent time at the property. The transcript reflects James's testimony that prior to Yoybe and Colin's separation, Colin and the children would visit the property "a little bit." Adam testified that he could not recall the last time he went to the property and that he was not "aware" of Yoybe ever spending time there.

¶33. In her final judgment, the chancellor found that the 79 acres in Utica is "the result of [Colin's] inheritance and are not marital property subject to division in this case." The chancellor explained that she found no "commingling and/or familial use of these assets" and "no evidence that the property in Utica was ever used for marital purposes." After reviewing the evidence Colin presented at trial, we cannot say that the chancellor reversibly erred in finding that Colin met his burden of proving that the 79 acres in Utica is his separate

12

property.[4]  We therefore find no abuse of discretion.

### B.    *Baird Engineering*

¶34.    Yoybe also argues that the chancellor abused her discretion "by finding that Baird Engineering was not marital property." Our review of the chancellor's division of the marital assets reflects that although the chancellor did list Baird Engineering as Colin's company, the chancellor did not classify the business as separate property.  We therefore find no merit to Yoybe's argument as to this issue.

### III.   Alimony

¶35.    Yoybe also argues that the chancellor abused her discretion by awarding Yoybe alimony in the amount of $1,000 per month for a period of six months.

¶36.    "Alimony is considered only after the marital property has been equitably divided and the chancellor determines one spouse has suffered a deficit." *Castle v. Castle*, 266 So. 3d 1042, 1053 (¶43) (Miss. Ct. App. 2018) (quoting *Lauro v. Lauro*, 847 So. 2d 843, 848 (¶13) (Miss. 2003)).  In determining whether to award alimony, the chancellor applies the factors set forth in *Armstrong v. Armstrong*, 618 So. 2d 1278, 1280 (Miss. 1993).  "[W]hen reviewing decisions on alimony, we do not apply or reweigh the *Armstrong* factors de novo

---

[4] *See Dean*, 304 So. 3d at 168 (¶48) (affirming chancellor's classification of real property as separate property after finding that "[t]he minimal use of this [real] property by the family occasionally riding 4-wheelers over part of the land is insufficient to convert these parcels to marital property"); *Dorsey v. Dorsey*, 972 So. 2d 48, 52 (¶12) (Miss. Ct. App. 2008) (finding a wife's testimony that the parties' children rode four wheelers on real property and marital funds were used to pay the property taxes was not sufficient to convert the real property to marital property where she "offered no proof that marital funds were used to pay the taxes [on the acreage], nor did [she] offer corroborating testimony establishing the frequency and extent to which the children used the land in question").

but instead recognize that alimony awards are within the discretion of the chancellor, and will not be reversed on appeal unless the chancellor abused his discretion." *Layton v. Layton*, 181 So. 3d 275, 279-80 (¶10) (Miss. Ct. App. 2015) (internal quotation marks omitted). In cases like the one before us, when a party claims that an alimony award is inadequate, "[this Court] will interfere only where the decision is seen as so oppressive, unjust[,] or grossly inadequate as to evidence an abuse of discretion." *Rogillio v. Rogillio*, 101 So. 3d 150, 153 (¶11) (Miss. 2012)).

¶37. After a four-day trial, the chancellor entered her final judgment articulating her detailed findings of fact on each of the *Armstrong* factors and awarding Yoybe alimony in the amount of $1,000 for six months. On appeal, Yoybe claims that the chancellor inappropriately faulted Yoybe for being a stay-at-home parent and "refused" to consider the difficulty of finding a well-paying full-time job upon reentering the work force after twenty years. Yoybe also argues that the chancellor misapplied two of the *Armstrong* factors: the significant disparity in Colin's and Yoybe's earning capacities and the length of the marriage. This Court has recognized that "a significant disparity in earning capacity is a major factor in the determination of a periodic alimony award." *Hammond v. Hammond*, 327 So. 3d 173, 180 (¶21) (Miss. Ct. App. 2021). Additionally, "the length of the parties' marriage 'may be the most critical factor in determining whether a disparity between the parties' incomes should be remedied by alimony.'" *Id*. at 180-81 (¶22) (quoting Deborah H. Bell, *Bell on Mississippi Family Law* § 9.04[5][a], at 291 (3d ed. 2021)).

¶38. The record shows that Colin is self-employed as a civil engineer and land surveyor.

14

Colin submitted two Rule 8.05 financial statements during the course of the litigation—his 2021 financial statement, which listed a gross monthly income of $10,808.64 and net monthly pay of $8,238.65, and his 2023 financial statement, which listed a gross monthly income of $11,236 and a net monthly pay of $8,562.43. *See* UCCR 8.05.

¶39. The record reflects that prior to the parties' marriage, Yoybe received her Bachelor of Science degree from the University of the Ozarks and also obtained a certification in special education. Yoybe taught first grade and Spanish at a private school from 2000 to 2002. The parties married in 2002, and their first child, Adam, was born in 2004. The parties agreed that Yoybe would stay home to care for and homeschool the children. As a result, Yoybe was out of the workforce for approximately twenty years.

¶40. In 2020, prior to the parties' separation, Colin removed the three oldest boys from Yoybe's homeschool environment and enrolled them in school. At the time of trial, Adam had graduated from high school, and the other four children attended private school. The record reflects that Colin paid the private school tuition for the boys.

¶41. Yoybe testified that before the parties separated, she had not worked outside of the home since 2002. Yoybe also testified that her teaching certification had expired. At the time of trial, the parties had been separated for approximately two years, and Colin had had sole physical custody of the children for nearly all that time. Yoybe admitted that during those two years, she had not taken any steps to renew her teaching license. Yoybe claimed that she had applied for several jobs, including ones at restaurants and a consignment shop, and applied to be a teaching assistant, but she had difficulty finding a job because she did not

15

have a resume. Yoybe admitted that at the time of trial she still had not created a resume.

¶42. Yoybe testified that the only job she could find was working at a hotel in the housekeeping department. At the hotel, Yoybe earned fourteen dollars an hour and worked approximately twenty-five hours a week, though she testified that the amount of hours she worked was based on how often the hotel needed her. Yoybe's 2023 Rule 8.05 financial statement listed her salary from her housekeeping job as ranging between $840 to $1,120 per month. Yoybe also indicated that she could work only part-time due to stress and her health.

¶43. The record reflects that prior to considering alimony, the chancellor had awarded Yoybe significant marital assets in ruling on equitable distribution, including $200,000 from the court-ordered sale or refinance of the marital home; seventy-five percent of Colin's Brighthouse Financial account valued at $62,892; one hundred percent of Colin's American Funds account, valued at $17,525; a BancorpSouth checking account with a balance of $10,896 (proceeds from the sale of the parties' rental property); and Yoybe's vehicle (or the insurance check associated with it).

¶44. The chancellor then considered alimony and applied the *Armstrong* factors. Relative to the issue on appeal, the chancellor found that the parties had a "lengthy" marriage of over twenty years. As for the parties' earning capacity, the chancellor determined that Colin has a "much greater wage earning capacity." The chancellor acknowledged that Yoybe had been out of the work force for approximately twenty years but found that "Yoybe has had the past two and half years to enter back into the work force and even resume teaching while receiving alimony, should she wish." The chancellor stated that Yoybe's college degree and

16

teaching certification, if renewed, would allow her to earn "significantly more than her housekeeping job." Despite her potential earning capacity as a teacher, the chancellor found that "Yoybe has chosen not to work on her teaching credentials" and "refuses to work full-time" because she cannot handle it.

¶45. Although the chancellor recognized that Colin has a greater earning capacity and greater income, the chancellor also found that "Colin has been left paying all the household expenses, all of the children's expenses including private school expenses, and alimony. Yoybe paid nothing towards the support of the children during the pendency of this litigation, not even her half of the uncovered medical bills as ordered." The chancellor also considered that under the temporary order, Yoybe received a lump sum of $7,500 to set up a separate dwelling and temporary monthly alimony of $1,500. The chancellor further determined that since the entry of the temporary order, Yoybe had received over thirty months of alimony, which totaled over $52,500.

¶46. After our review, and based on the facts of this particular case, we find that the chancellor's award of alimony to Yoybe in the amount of $1,000 per month for six months is supported by substantial credible evidence in the record. Additionally, we find that the award was not oppressive, unjust, or grossly inadequate. We therefore find no abuse of discretion.

### IV. Yoybe's Motion for a Continuance

¶47. Yoybe next asserts that the chancellor abused her discretion in denying Yoybe's motion for a continuance. We recognize that "the decision to grant or deny a motion for a

17

continuance is within the sound discretion of the trial court and will not be reversed unless the decision results in manifest injustice." *Shannon v. Shannon*, 357 So. 3d 1043, 1058-59 (¶37) (Miss. Ct. App. 2022). "Prejudice must result from the denial in order to have that decision reversed." *Id.* Here, Yoybe asserts that the chancellor's denial of her motion to continue caused her to suffer prejudice by losing custody of her children.

¶48. As stated above, the trial in this case began on April 12, 2023. After the three days of testimony, the trial was continued until June 2023. On June 12, 2023, a few days before the trial was set to resume, Yoybe made an abuse report with the Clinton Police Department about an incident that allegedly occurred in January 2022. The chancellor held a shelter hearing on June 22, 2023, and ultimately found Yoybe's abuse allegations to be unsubstantiated. The chancellor then ordered the trial on the merits to resume on October 2, 2023. The chancellor also ordered Yoybe to submit to a psychological evaluation before the trial resumed.

¶49. Approximately two months before the trial resumed, Yoybe obtained new trial counsel. On October 2, 2023, on the morning the trial was set to resume, Yoybe's counsel made an ore tenus motion to continue the trial based on the pending psychological evaluation. Yoybe's counsel informed the chancellor that Yoybe had complied with the court's order to undergo the psychological evaluation and that she had been evaluated approximately a week before trial; however, counsel had yet not received the results.[5]

_____

[5] The chancellor's final judgment states that the court received the results from Yoybe's psychological evaluation on March 27, 2024. The chancellor found that "the evaluation was solely based on [Yoybe's] self[-]reported narrative, which is not supported by the credible evidence in this case. The [c]ourt does not find the evaluation to be helpful

Yoybe's counsel asserted that a continuance was necessary because Yoybe "suffers from something wrong mentally" and was a hindrance to counsel in trying to prepare for the case. Colin's counsel objected to the continuance, arguing that the case had been pending for over two years and that Yoybe had already rested her case prior to the motion to continue.

¶50. After hearing testimony from both Colin and Yoybe on the issue of Yoybe's mental health and past treatment, the chancellor denied the request for a continuance. The chancellor found that Yoybe had been receiving some type of treatment for her mental health since 2015, and the chancellor determined that continuing the matter would not be helpful. The chancellor explained that if Yoybe could not assist with her case due to mental health issues, the chancellor could appoint a conservator; however, the chancellor found that Yoybe "is [not] to the point that a conservatorship would be warranted or necessary or that a conservator is going to be able to assist more than [Yoybe] is."

¶51. After reviewing the record, we cannot find that any manifest injustice or prejudice resulted from the denial of Yoybe's motion for a continuance. At the time Yoybe's counsel made the motion, the case had been pending for over two years, and Yoybe had already testified and rested her case. Accordingly, we find that the chancellor did not abuse her discretion in denying Yoybe's motion for a continuance.

### V. Attorney's Fees and GAL Fees

¶52. Yoybe's next assignment of error pertains to the abuse allegations she made in June 2023. Yoybe argues that the chancellor abused her discretion by requiring Yoybe to pay

and is not considered in rendering this opinion."

19

Colin's attorney's fees pertaining to the abuse allegations and seventy percent of the GAL fees. Yoybe claims that the chancellor awarded attorney's fees based on an erroneous interpretation of the term "abused child" under Mississippi Code Annotated section 43-21-105(m).

¶53. "The matter of awarding attorney's fees is largely entrusted to the sound discretion of the chancellor." *Tidmore v. Tidmore*, 114 So. 3d 753, 757 (¶9) (Miss. Ct. App. 2013). "Therefore, we are reluctant to disturb a chancellor's discretionary determination whether to award attorney's fees or the amount of any award." *Id*.

¶54. In June 2023, Yoybe contacted the Clinton Police Department regarding possible sexual abuse that had occurred at her residence approximately a year and a half earlier. Yoybe informed the police department that in January 2022, during her period of visitation, she discovered James, who was thirteen years old at the time, and Nolan, who was five years old at the time, in a dark closet at Yoybe's house. According to Yoybe, James and Nolan were under a sheet, and Nolan's pants were down. Yoybe stated that the boys claimed to be playing doctor, but Nolan indicated that James had photographed his "peepee" as well as "squished" and "pulled" his "peepee" repeatedly. Yoybe recorded the boys' statements on her phone.

¶55. The police department referred the matter to the Hinds County Department of Child Protection Services (CPS). On June 16, 2023, the Hinds County Youth Court issued an oral order stating that the five Baird children were to remain in Yoybe's custody and submit to a forensic interview. The following day, the Hinds County Youth Court reversed the order,

20

and the children were returned to Colin.

¶56.    On June 22, 2023, the chancellor retained jurisdiction over the matter pursuant to Mississippi Code Annotated section 43-21-151(1)(c) (Supp. 2024)[6] and conducted a shelter hearing[7] on the abuse allegations.[8]  The chancellor heard testimony from Yoybe, Colin, and the GAL.  During the hearing, Yoybe recounted the events that occurred on January 15, 2022.  Yoybe admitted that she had met with the GAL three times after the incident allegedly occurred, but she never reported the alleged abuse to the GAL.  Yoybe claimed that at the time, she did not realize the actions constituted sexual abuse.

¶57.    The GAL testified that he was unable to reach the CPS worker assigned to the case, despite multiple attempts to contact her.  However, the GAL did speak with the CPS supervisor who was the on-call worker when Yoybe reported the alleged abuse.  According

---

[6] Section 43-21-151(1)(c) provides as follows:

When a charge of abuse or neglect of a child first arises in the course of a custody action between the parents of the child already pending in the chancery court and no notice of such abuse was provided prior to such chancery proceedings, the chancery court may proceed with the investigation, hearing and determination of such abuse or neglect charge as a part of its hearing and determination of the custody issue as between the parents, notwithstanding the other provisions of the Youth Court Law.

[7] *See* Miss. Code Ann. § 43-21-309 (Supp. 2017); U.R.Y.C.P. 16.

[8] The supreme court has explained that pursuant to section 93-5-23, "a chancellor has two options for handling abuse allegations lodged during a custody proceeding. The chancellor may either (1) stay the proceeding until the allegations are fully investigated by DHS or (2) adjudicate the abuse allegations subject to Mississippi Code [Annotated] [s]ections 43-21-121 and 151 and the Mississippi Uniform Rules of Youth Court Practice." *Smith v. Smith*, 206 So. 3d 502, 510 (¶13) (Miss. 2016).  Here, the chancellor chose the second option.

to the GAL, the CPS supervisor indicated that "it was her opinion that this was a custody dispute and that she didn't believe that CPS should be involved." When the GAL asked the CPS supervisor why she felt that way, the supervisor explained that the allegations could not be substantiated due to the amount of time that had passed since the incident and because a GAL had already been appointed in the pending chancery case. The GAL also agreed that Yoybe's allegations could not be substantiated.

¶58. The chancellor ultimately determined that the abuse allegations were unsubstantiated. Colin filed a motion pursuant to section 93-5-23 seeking attorney's fees as a result of Yoybe's unfounded sexual abuse claims. After a hearing on the matter, the chancellor granted the motion. On August 30, 2023, the chancellor entered an order requiring Yoybe to pay Colin's attorney's fees in the amount of $10,000 and pay seventy percent of the GAL's fees.

¶59. On appeal, Yoybe maintains that the chancellor's decision to award attorney's fees was based on the erroneous interpretation of an "abused child" under section 43-21-105(m). In the order awarding Colin attorney's fees, the chancellor references the definition of "abused child" set forth in section 43-21-105(m) and provides that "the facts and circumstances as they have been developed surrounding the alleged incident on January 15, 2022 do not meet the statutory definition whereby the Baird children would be considered abused pursuant to section 43-21-105(m), and no further investigation on this matter is warranted."

¶60. However, from reviewing the record in full, we find that the chancellor did not base

her decision to award attorney's fees on whether the Baird children were abused children pursuant to section 43-21-105(m). Rather, the August 30, 2023 order granting Colin's motion for attorney's fees shows that the chancellor awarded attorney's fees to Colin because she found Yoybe's abuse allegations to be unsubstantiated. In the order, the chancellor cited section 93-5-23, which required the chancellor to impose attorney's fees for unsubstantiated allegations of abuse:

> If after investigation by the Department of Human Services or final disposition by the youth court or family court allegations of child abuse are found to be without foundation, the chancery court shall order the alleging party to pay all court costs and reasonable attorney's fees incurred by the defending party in responding to such allegation.

Miss. Code Ann. § 93-5-23 (Rev. 2021). In that same order, the chancellor stated that the "[abuse] allegations are hereby found to be unsubstantiated." Moreover, the chancellor found that in making these allegations, "Yoybe was clearly attempting to manipulate the legal system to get what she wants" and that her "goal was to separate the sibling sets." The chancellor stated that Yoybe's allegations "caused her to lose a great deal of credibility with the [chancellor]." Given all these findings, "the chancellor was well within [her] authority to award [Colin] the attorney's fees []he incurred defending against the allegations." *Campbell v. Campbell*, 269 So. 3d 426, 431 (¶18) (Miss. Ct. App. 2018) (citing Miss. Code Ann. § 93-5-23).

## VI. Guardian Ad Litem

¶61. Finally, Yoybe argues that the GAL failed to perform his mandatory duty under section 93-5-23. Specifically, Yoybe claims that the GAL failed to investigate Yoybe's June

23

2023 report of sexual abuse. Yoybe raises this issue for the first time on appeal. The supreme court has held that when the sufficiency of the guardian ad litem's investigation or report is raised for the first time on appeal, the argument is waived. *S.D.P. v. Harrison Cnty. Dep't of Child Prot. Servs.*, 397 So. 3d 466, 475 (¶¶43-45) (Miss. 2024).

¶62. Procedural bar notwithstanding, we find no merit to Yoybe's argument. The record reflects that prior to trial, a physical altercation occurred between Yoybe and James. As a result, the chancellor entered an order in May 2022 appointing a GAL. The chancellor later clarified that the GAL's appointment was a mandatory appointment, rather than discretionary. In June 2023, the chancellor retained jurisdiction of Yoybe's abuse allegation regarding James and Nolan pursuant to section 43-21-151(1)(c).

¶63. The supreme court has explained that "[w]hen a chancellor chooses to hear the abuse allegation during a custody hearing, appointment of a GAL is mandatory." *Smith v. Smith*, 206 So. 3d 502, 510 (¶14) (Miss. 2016). "Upon appointment, a [GAL] is obligated 'to protect the interests of the children for whom he has been appointed' and is authorized to 'investigate, make recommendations to the court or enter reports as necessary to hold paramount the child's best interest.'" *Barber v. Barber*, 288 So. 3d 325, 332 (¶27) (Miss. 2020) (quoting Miss. Code Ann. § 43-21-121(3) (Supp. 2019)). Additionally, "the GAL must either submit a written report or testify, and must make recommendations to the court if requested. The GAL is subject to cross-examination if testifying." *Smith*, 206 So. 3d at 510 (¶14) (citations omitted).

¶64. At the shelter hearing on the June 2023 abuse allegation, the GAL testified that he had

24

spent approximately six hours investigating the allegation. The GAL explained that despite his unsuccessful attempts to contact the CPS case worker assigned to the case, he did communicate with the CPS supervisor regarding the allegations. The GAL stated that he did not speak to anyone at the Clinton Police Department, but he testified that the CPS supervisor was present at the Clinton Police Department when Yoybe reported the abuse. The GAL ultimately opined that the abuse allegations could not be substantiated. The chancellor later entered an order agreeing that the abuse allegations could not be substantiated.

¶65. The record reflects that on March 30, 2023, the GAL issued his written final report detailing his investigation and recommendation as to custody of the Baird children. On the final day of trial in October 2023, the chancellor acknowledged that GAL had issued his report prior to the June 2023 abuse allegations, and she asked the GAL if, in light of the June 2023 abuse allegations, his opinion had changed. The GAL testified that prior to the June 2023 abuse allegation, he had recommended that Yoybe have an extended visitation with Nolan and Eli every other Thursday through Monday. The GAL explained that after he made that recommendation, the chancellor had entered an order requiring that Yoybe's visitation with the younger children be supervised. The GAL testified that based on the events and allegations that transpired since he issued his report, he recommended that Yoybe's supervised visitation continue "on a sliding scale" based on his concern that Yoybe would "rehash" the June 2023 abuse allegations and coach the children to make additional statements.

¶66. The GAL also expressed his concern regarding the results of Yoybe's psychological

evaluation, and he indicated that those results could impact his opinion as to Yoybe's visitation. Counsel for Yoybe and Colin also questioned the GAL regarding his opinion and recommendation as to visitation.

¶67. After reviewing the record, we find that the GAL properly performed his duties under section 93-5-23. *See Barber*, 288 So. 3d at 332 (¶28) (In a mandatory appointment, a GAL "[is] required to submit a written report or testify, and, if requested, to make recommendations to the court.").

**CONCLUSION**

¶68. After our review, we find no reversible error. We therefore affirm the chancellor's final judgment.

¶69. **AFFIRMED.**

**BARNES, C.J., WILSON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND WEDDLE, JJ., CONCUR. LASSITTER ST. PÉ, J., NOT PARTICIPATING.**